# United States Court of Appeals
## For the First Circuit

No. 21-1689

JAMILET GONZÁLEZ-ARROYO, in representation of her minor son,
ALG,

Plaintiff-Appellant,

v.

DOCTORS' CENTER HOSPITAL BAYAMÓN, INC.; DR. BENITO HERNÁNDEZ-
DIAZ; JANE DOE, CONJUGAL PARTNERSHIP HERNÁNDEZ-DOE,

Defendants-Appellees,

JOHN DOES 1,2, AND 3; A, B, AND C CORPORATIONS; UNKNOWN
INSURANCE COMPANIES A THROUGH H,

Defendants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Raúl M. Arias-Marxuach, U.S. District Judge]

Before

Barron, Chief Judge,
Howard and Thompson, Circuit Judges.

David Efron, with whom Law Offices of David Efron, P.C. was
on brief, for appellant.
Roberto Ruiz Comas, with whom RC Legal & Litigation Services,
PSC was on brief, for appellee Doctors' Center Hospital Bayamón,
Inc.
Giovanni Picorelli Ayala for appellee Dr. Benito Hernández-
Diaz.

November 22, 2022

**THOMPSON**, **Circuit Judge**. Alleging negligent conduct during the birth of her son ALG, Jamilet González-Arroyo ("González") brought a medical malpractice suit on his behalf in the District of Puerto Rico against Doctors' Center Hospital Bayamón ("DCHB") and Dr. Benito Hernández-Diaz ("Hernández" and all together, the "Hospital"). González claimed that the Hospital failed to notice and treat ALG's oxygen-loss at birth, which caused him serious cognitive injury -- he would later be diagnosed with autism and cerebral palsy.

To connect the Hospital's alleged conduct to ALG's injuries (what we call causation), González hired an expert to review her medical files and submit a report with his opinions (standard practice in these types of actions). Ultimately, this dispute is over that report. Before the parties went to trial, the district court, on the Hospital's motion, struck the expert's report and testimony, reasoning that it was too speculative and otherwise failed to conform to established rules for such reports. Without it, the district court concluded González could not make her case and granted the Hospital's summary judgment motion, dismissing González's lawsuit with prejudice. Only then did González try to supplement the report and fix its apparent deficiencies, and with that she asked the district court to reconsider its prior rulings. In the interim, González appealed to us, so the district court decided it had lost jurisdiction over

the case and denied the reconsideration motion.  González says the district court got it all wrong.  We largely disagree and affirm the district court's grant of the motion in limine and motion for summary judgment.  We also affirm the denial of the motion for reconsideration, albeit for different reasons than the district court, which we will get to.

## BACKGROUND

We start with some relevant background of ALG's birth, but with a caveat:  the record before us contains no medical files or exhibits, so we've done our best to weave together what happened solely from the parties' filings below, two expert reports and one expert deposition.

In October 2010, González, a couple months pregnant with ALG, began to see Hernández for prenatal care, expecting to give birth sometime in May 2011.  González had been pregnant twice before; one had ended in a miscarriage, and the other she delivered by cesarean section (commonly called a C-section).  Early in the morning of April 26, 2011, González, who was then about thirty-eight weeks along, arrived at DCHB experiencing contractions and abdominal pain -- considered to be in early labor. Once admitted, González received antibiotics, her regular epilepsy medicine and pain medicine.  At 10:45 AM, after ingesting the pain medication, González experienced an isolated instance of elevated blood pressure.  Throughout the morning, ALG's heart rate was observed

- 4 -

with a fetal heart rate monitor.[1]  At 11:45 AM, González was taken to the operating room for a C-section, where she began spinal anesthesia and by 12:05 PM the spinal was completed.  During this twenty-minute window, González experienced lowered blood pressure. González's C-section began at 12:10 PM, ALG entered the world at 12:12 PM, and the whole procedure wrapped up at 12:25 PM. According to González, at some point before ALG's birth, he experienced a sudden loss of oxygen, resulting in brain injury.

After ALG's delivery, he seemed to be healthy as reflected in normal APGAR scores of eight and nine (the test of a newborn's physical health shortly after birth).[2]  But two days after his birth, ALG was admitted to an intensive care unit for suspected sepsis, jaundice, and other conditions, and spent a little over a week there receiving treatment before heading home. Then three years later, ALG was diagnosed with autism and cerebral palsy.  González asserts in her complaint that the Hospital caused

---

[1] The parties refer to the monitor's output as "strips," so we do the same.  They also dispute what time the monitoring stopped, which we address later.

[2] "APGAR is a quick test performed on a baby at 1 and 5 minutes after birth.  The 1-minute score determines how well the baby tolerated the birthing process.  The 5-minute score tells the health care provider how well the baby is doing outside the mother's womb."  Apgar score, National Library of Medicine (last visited Nov. 18, 2022), http://medlineplus.gov/ency/article/003402.htm.  The test examines the baby's breathing effort, heart rate, muscle tone, reflexes, and skin color.  Id.

these cognitive and developmental disabilities by failing to timely perform her C-section, by failing to appropriately monitor ALG's heart rate, and/or by failing to properly resuscitate ALG.

In response to these events, González, in January 2017, filed a complaint lodging a single count of negligence against the Hospital, with estimated damages at over $10 million. After a lull in activity the parties and the court eventually worked out a discovery schedule, all of which was to be complete by the end of April 2018. As pertinent here, each side would exchange expert reports, and both González and her expert, Dr. Barry Schifrin, would sit for depositions.

In February 2018, the Hospital deposed Dr. Schifrin, where counsel throughout challenged the conclusions in his report. Notably, Dr. Schifrin had written his report in December 2016, before González had even filed her complaint and accordingly, it was prepared without the benefit of any formal discovery. His report refers to prenatal, labor and delivery, and neonatal records from DCHB, as well as ALG's follow-up medical chart (not from DCHB), but notes that he did not have (and thus did not review) the fetal monitoring strips, therefore writing that "the facts of this case are significantly compromised." In the report, Dr. Schifrin wrote that he "believe[s] that [ALG's oxygen-loss] develops as a result of the frequent contractions, placental [abruption] . . . and the [drop in blood pressure] associated with

the spinal anesthesia."  At the deposition, however, Dr. Schifrin explained that the basis for his report's statement that ALG experienced oxygen-loss at birth came from "[s]omebody put[ting] [it] in this baby's subsequent medical record," not from DCHB's birth records.  Hospital counsel then presented Dr. Schifrin with at least some of the fetal monitoring strips, those generated up until about 10:40 AM or 90 minutes before González's C-section.[3] After reviewing the strips, Dr. Schifrin testified that he could not point to any evidence of placental abruption[4] ("I don't know. It's just a potential explanation."), and that the strips he reviewed showed "there are no frequent contractions."  Dr. Schifrin further testified, again after reviewing the strips, "I am happy to tell you the baby is not injured up to 10:40," so there were "details" of his report he was "going to change."  "Assuming [the strips] were [consistent] to the time of the spinal," Dr. Schifrin

---

[3] We say "some" because counsel showed Dr. Schifrin strips that appear to end around 10:40 AM, while the Hospital's expert, Dr. Francisco Gaudier, wrote that he reviewed strips ending at 11:27 AM.  The record contains no explanation of this time difference, but González's counsel asserts that the remaining strips were withheld and/or spoliated.  We'll deal with that contention in a bit.

[4] "Placental abruption occurs when the placenta partly or completely separates from the inner wall of the uterus before delivery.  This can decrease or block the baby's supply of oxygen and nutrients and cause heavy bleeding in the mother."  Placental abruption, Mayo Clinic (last visited Nov. 18, 2022), http://www.mayoclinic.org/diseases-conditions/placental-abruption/symptoms-causes/syc-20376458.

said, "if there is any injury, it's related to the events of the spinal," because González's blood pressure dropped during it, and the timeline of the spinal suggested a delay from anesthetizing González to getting the baby out. Prior to reviewing the strips at the deposition, however, Dr. Schifrin hedged, "[I]f I say there was a potential loss of oxygen with a drop in the maternal blood pressure, I don't have a problem saying that. Did it cause the injury? That's for somebody else to state." Then, after reviewing the strips that were made available, Dr. Schifrin testified, "I just can't tell you . . . the effect of the spinal" because that segment of the monitoring strips was not available. Post-deposition, Dr. Schifrin did not supplement or amend his original report until after the district court had dismissed González's complaint.

The Hospital brought in its own big gun expert, Dr. Francisco Gaudier, who submitted his expert report in March 2018. Indicating that he reviewed monitoring strips up until 11:27 AM (shortly before González went to the OR), among other hospital records, Dr. Gaudier concluded that there was no evidence to suggest ALG suffered oxygen-loss prior to his birth, nor was there evidence of frequent contractions or a significant drop in blood pressure (hypotension) from the spinal anesthesia, and therefore the Hospital did not cause ALG's injuries. González, it appears,

opted not to depose Dr. Gaudier, nor did she challenge the district court's consideration of his report.

From there, discovery concluded, and all signs pointed to trial. In August 2019, the court scheduled a final pretrial conference for late March and a trial date for April of 2020. But then, a month before the pretrial conference, DCHB filed a motion in limine, joined by Hernández, urging the court to exclude Dr. Schifrin's report and testimony on several bases, including that he failed to supplement his report, specify a national standard of care, cite medical literature as Fed. R. Civ. P. 26 requires, and provide conclusions based on objective and verifiable methodology as Fed. R. Evid. 702 and Daubert (the seminal expert evidence case) demand.

Over González's written objection, which did not include a request for a hearing, the district court, based on the written submissions, granted the Hospital's motion in limine. In its opinion and order, the court first reasoned that the report was "improperly founded and therefore inadmissible," as Dr. Schifrin "ma[de] assumptions in the absence of . . . data," such as the monitoring strips, notations regarding González's contractions which would show their frequency, intensity or duration, and any neuroradiological examinations of ALG (like an MRI). As to the strips, the court pointed out that, "[e]ven though [Dr. Schifrin] had not examined [them] at the time he rendered his expert report,"

he had nonetheless concluded that the Hospital breached the standard of care because attending personnel did not "'properly understand the evolution of changes in the fetal heart rate pattern,'" an opinion based on what he assumed the strips and other medical documentation would show. As the court held, providing opinions based on assumptions rather than on "sufficient facts or data [or] the product of reliable principles" rendered the report inadmissible. Continuing, the court highlighted two other deficiencies with the report: it failed to cite any medical literature, as Rule 26 requires, and it failed to specify whether the standard of care mentioned in the report was, as Puerto Rico law requires, the national standard of care.[5] Given the deficiencies it identified in the expert report, the district court found that "Dr. Schifrin's expert report would **not** assist the trier of fact with regards to identifying, let alone understanding the applicable standard of care and any deviation from it by the Defendants." Finally, the court found that Dr. Schifrin had a duty to supplement his report after testifying at his deposition that the strips showed no injury to ALG up until 90 minutes before his birth.

---

[5] In his report, Dr. Schifrin wrote, "The standard of care in a patient with a previous cesarean section complaining of contractions requires the application of a fetal monitor."

Meanwhile, the district court rescheduled trial from April 12, 2020, down the road to November 2021 because of COVID-19's pandemic sweep across Puerto Rico (as elsewhere). But in the interim, DCHB, again joined by Hernández, filed a motion for summary judgment in December 2020, based on their successful motion in limine: without an expert, they urged, González could not prove elements of her negligence claim, and therefore had no case. In a written opposition to the Hospital's motion, González argued as relevant to this appeal that even without Schifrin's testimony, she could still make her case by relying on the Hospital's expert, Dr. Gaudier, whom she had reserved the right to utilize at trial. Agreeing with appellees that without Dr. Schifrin, González could not establish causation as González pointed to nothing in Dr. Gaudier's report that would support such a finding, the district court granted the motion and in July 2021, entered judgment for the Hospital, dismissing González's action in its entirety.

After judgment entered, González filed a motion for reconsideration as to both the dismissal and exclusion of Dr. Schifrin's testimony and report and in doing so attached a recently amended expert report from Dr. Schifrin. While the motion for reconsideration was pending, González filed her first notice of appeal, prompting the district court to deny the motion, believing it had lost jurisdiction over the case. González then re-filed her notice of appeal and here we are.

- 11 -

**DISCUSSION**

González appeals the district court's grant of the Hospital's motion in limine and for summary judgment, and denial of her motion for reconsideration. The spoiler, though, is that the bulk of González's problems flow from the exclusion of her expert; without one, she cannot make out a medical malpractice claim.[6] So, we begin with González's protestations over the district court's grant of appellees' motion in limine and move on to her remaining objections to the district court's summary judgment and reconsideration rulings.

**Exclusion of Expert Testimony**

González challenges the exclusion of Dr. Schifrin's testimony and report.[7] Accordingly, we review a "district court's decision to admit or exclude expert testimony for abuse of discretion." Milward v. Rust-Oleum Corp. (Milward II), 820 F.3d

---

[6] In Puerto Rico, whose substantive law controls this diversity suit, "to prevail on a medical malpractice claim, . . . a plaintiff must prove by a preponderance of the evidence both that the standard of care was not met, and that the failure to meet an acceptable standard caused the harm." Pagés-Ramírez v. Ramírez-González, 605 F.3d 109, 113 (1st Cir. 2010). To establish both elements, "a trier of fact will generally need the assistance of expert testimony." Id.

[7] A note about our appellate jurisdiction -- González's appeal from the district court's final judgment "encompass[es] not only [that] but also all interlocutory orders," like the order excluding Dr. Schifrin's testimony, "that merge into it." López-Ramírez v. Toledo-González, 32 F.4th 87, 93 n.4 (1st Cir. 2022) (quoting Martínez-Serrano v. Quality Health Servs. of P.R., Inc., 568 F.3d 278, 283 (1st Cir. 2009)).

469, 472 (1st Cir. 2016). Under that standard, we give "broad deference to the determination made by the district court as to the reliability and relevance of expert testimony." Beaudette v. Louisville Ladder, Inc., 462 F.3d 22, 25 (1st Cir. 2006). And we will reverse only if "the ruling at issue was predicated on an incorrect legal standard or we reach a 'definite and firm conviction that the court made a clear error of judgment.'" United States v. Corey, 207 F.3d 84, 88 (1st Cir. 2000) (quoting United States v. Shay, 57 F.3d 126, 132 (1st Cir. 1995)); see also Schubert v. Nissan Motor Corp. in U.S.A., 148 F.3d 25, 30 (1st Cir. 1998) ("In the context of the admission or exclusion of opinion evidence, we have stated that we will uphold the district court's ruling in this area unless it is manifestly erroneous.") (internal quotation marks and citation omitted).

*Reliability of Dr. Schifrin's Report*

Before tackling González's arguments, a bit more background on the admissibility of expert evidence would be helpful. As we've previously noted, to provide admissible testimony, an expert must render conclusions "'in a scientifically sound and methodologically reliable fashion.'" Milward v. Acuity Specialty Prods. Grp., Inc. (Milward I), 639 F.3d 11, 15 (1st Cir. 2011) (quoting Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling Co., 161 F.3d 77, 85 (1st Cir. 1998)). Yes, a district court should admit an expert "[s]o long as [their] scientific testimony

- 13 -

rests upon 'good grounds,' based on what is known." Id. (quoting Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 590 (1993)). But neither Daubert nor Rule 702 permits expert opinions grounded only in the unsupported assertions of the expert. See López-Ramírez, 32 F.4th at 94 (quoting Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997)). If that's the case, a "'court may conclude that there is simply too great an analytical gap between the data and the opinion proffered,'" provided "that gap is not 'of the district court's making.'" Id. (first quoting Gen. Elec. Co., 522 U.S. at 146, then quoting Milward I, 639 F.3d at 22).

The district court excluded Dr. Schifrin's testimony, in part, because it found that Dr. Schifrin based his conclusions on assumptions about the fetal monitoring strips and other medical records without having reviewed these records beforehand. And when confronted with all but the last 90 minutes of these unseen documents during his deposition, Dr. Schifrin not only conceded the records up until then demonstrated no fetal stress, but he also went on to simply hypothesize an alternative theory of injury from the spinal anesthesia without identifying the basis for such an opinion. In other words, Dr. Schifrin's failure to point to and consider material medical records before offering a scientific opinion produced, from the district court's perspective, a significant analytical gap in the report. In response to the district court's ruling, González lobs a few counterarguments.

- 14 -

But each misses the mark, and none attacks the district court's central point that Dr. Schifrin failed to connect his opinions to sufficient, reliable data. But we'll take on the incoming.

As a threshold matter, González argues that the district court should have held a Daubert hearing -- we gather sua sponte -- on the admissibility of Dr. Schifrin's testimony before excluding it on the motion in limine papers. Yet González cites no authority for the proposition that a court abuses its discretion by declining to hold a hearing, and even concedes (rightly) that "there is no particular procedure that [the court] is required to follow," unless the motion raises a novel legal issue. See United States v. Phillipos, 849 F.3d 464, 471 (1st Cir. 2017) (district court not required to hold Daubert hearing to make reliability determination of proffered expert); United States v. Pena, 586 F.3d 105, 111 n.4 (1st Cir. 2009) (no abuse of discretion when district court excluded expert without a hearing if no novel issue is raised). Indeed, we have imposed no such requirement that the district court hold a hearing, and González has not developed any argument that the motion in limine raised a novel or even particularly complicated issue for the district court to consider.

Next, González defends Dr. Schifrin's report itself from the district court's scorn. She contends that, despite not having reviewed the fetal monitoring strips, Dr. Schifrin's causation analysis "complies completely" with Daubert and Rule 702 -- that

is, it should not have been excluded as unreliable. Why? González insists Dr. Schifrin's report was admissible because it opined on a cause of injury to ALG and "the only thing [he] could not specifically indicate is the precise timing of the injury." She blames the Hospital for not producing the fetal monitoring strips for Dr. Schifrin's review, accusing them, in passing fashion, of withholding or spoliating a key portion of the strips, specifically the last 90 minutes. Then, she claims that Dr. Schifrin's report nevertheless complies with Daubert and Rule 702 because he employs an inherently reliable methodology -- a so-called differential diagnosis -- to formulate his scientific opinion.

Let's talk about González's claim of spoliation. To demonstrate the same, González would need to show that the strips had been "destroyed or not preserved." Gomez v. Stop & Shop Supermarket Co., 670 F.3d 395, 399 (1st Cir. 2012). Although González does throw around the word "spoliation" in her brief, she makes no real argument in support of such an assertion, nor does she point to any evidence in the record that would make such a showing. Thus, we deem the argument waived. See Vargas-Colón v. Fundación Damas, Inc., 864 F.3d 14, 24 (1st Cir. 2017) (quoting United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) (Arguments raised in a "perfunctory manner . . . are deemed waived.")).

Moving to the withholding accusation regarding the fetal monitoring strips, González has similarly failed to explain in her

briefs how this supposedly happened.  See id.  Even if we were willing to overlook this waiver -- and we are not -- her argument would still fail.  Taking our own walk through the record, we conclude there is nothing in it to save her withholding claim. Here's what we find.  Like we earlier mentioned, Dr. Schifrin wrote his original report in December 2016 before González filed suit, meaning at that juncture, there was no formal discovery to be had and therefore no chance for DCHB to withhold anything.  Then, Dr. Schifrin was deposed about fourteen months after he wrote his report, while discovery was ongoing.  The week prior, DCHB sent a Dropbox link with documents they planned to use at the deposition to counsel for González.  Counsel for González conceded at oral argument that the link contained at least some of the strips but claimed that neither he nor Dr. Schifrin had time to review them beforehand.[8]  Once at the deposition, Dr. Schifrin confirmed that he had yet to receive or review the strips until opposing counsel presented them.  Only then did Dr. Schifrin review the strips, but he was only presented with a portion of them, up until 10:40 AM. Counsel for González did not make an on-the-record request for the

---

[8] Counsel asserted that the Hospital sent the link to his office (not him) on a Friday afternoon, right before he spent the weekend traveling to defend Dr. Schifrin's deposition the following Monday morning, so there was no chance for him or Dr. Schifrin to review it beforehand.  Counsel misspoke -- the e-mail transmitting the link was sent to a "davidefron" on the Wednesday morning before he began his travels.

remaining strips, nor does González point us to any evidence in the record, nor have we found any, that she ever formally requested production of the strips or that there was a discovery dispute over them, before or after Dr. Schifrin's deposition.[9] That's all we have. DCHB may very well have withheld the strips, but nothing in the record or the trial court docket explains what happened. So that's that.

Notwithstanding any concerns about spoliation or withholding (which, we add, amount mostly to red herrings), the district court never identified the *timing* of the injury as an issue impinging upon the reliability of Dr. Schifrin's report or methodology; instead, the court found the report unreliable because it made conclusions about what certain material evidence must have shown without Dr. Schifrin ever having looked at it before issuing his report. More on that in a bit.

We turn next to González's contention that Dr. Schifrin's methodology was fundamentally reliable. This is so, González says, because in forming his opinion Dr. Schifrin utilized a methodology described as a "differential diagnosis,"[10] which she

---

[9] At oral argument, DCHB's counsel stated that González only made one request for medical records, all prior to filing her complaint, but never made a formal discovery request for medical records (including the strips) after litigation commenced. González's counsel declined to rebut that description of events.

[10] A differential diagnosis is when a provider puts together a list of conditions with similar symptoms, then conducts additional tests that might rule out some of these conditions and

notes "has been the hallmark of the medical profession for generations of doctors," and in this case, "is scientifically reliable [as] . . . to the relationship of the fetal heart rate pattern and oxygenation."  Problem is, Dr. Schifrin's report or testimony never explains the term differential diagnosis or how he applied it, nor does González discuss it below in more than a passing line or explain it in her briefing to us.  (Probably for that reason, the district court chose not to explicitly address it.)  On that basis alone, we have affirmed the district court's exclusion in a similar instance.  See López-Ramírez, 32 F.4th at 96 (no abuse of discretion where district court excluded expert testimony as unreliable and plaintiff failed to argue that reliability conclusions were erroneous) (citing Zannino, 895 F.2d at 17).

Moreover, our case law explicitly rejects the inherent reliability of a differential diagnosis.  See Milward II, 820 F.3d at 476.  While a "differential diagnosis *can* be a reliable method of medical diagnosis," the expert proffering it "still must show that the steps taken as part of that analysis — the 'ruling out' and the 'ruling in' of causes — were accomplished utilizing

---

lead to a final diagnosis.  Differential Diagnosis, Cleveland Clinic (last visited Nov. 18, 2022), https://my.clevelandclinic.org/health/diagnostics/22327-differential-diagnosis; see also Milward II, 820 F.3d at 472 (describing differential diagnosis as "essentially a process of elimination").

scientifically valid methods."  Id. (cleaned up and emphasis added).

Here, the district court took issue with the reliability of Dr. Schifrin's analysis on the whole because (and not to be redundant) he made assumptions about causation and injury without knowing if the evidence would support them and never modified his opinion when he learned he assumed wrongly.  The court stressed how Dr. Schifrin "repeatedly states" he lacked the fetal monitoring strips altogether and any notes about the frequency and duration of González's contractions.

And with respect to the data that was available to Dr. Schifrin, González never explains, here or below, why the data he did review, when viewed through a differential diagnosis lens, would be sufficient to form a reliable opinion.  Nor does González explain, by pointing to any record evidence or any challenge to the court's reasoning, how the district court abused its discretion in calling out Dr. Schifrin's methodological shortcomings.  See id. (concluding that district court did not abuse its discretion in excluding differential diagnosis opinion where plaintiffs failed to show any reliable method for ruling in potential cause). Rather than giving us some analysis, what González hands us instead are several pages of unhelpful quotes from a sampling of our prior expert opinion cases without explaining how anything in those opinions helps her out.

All said, we conclude that the district court did not abuse its discretion in excluding Dr. Schifrin's testimony as unreliable and affirm the district court's decision to grant the motion in limine on reliability grounds.[11]

### Summary Judgment

Next, we deal with González's contention that, regardless of the district court's exclusion of Dr. Schifrin's testimony, the court still erred in granting summary judgment to the Hospital. Our review is de novo. Garcia-Garcia v. Costco Wholesale Corp., 878 F.3d 411, 417 (1st Cir. 2017). "To defeat a motion for summary judgment, the nonmoving party must demonstrate the existence of a trialworthy issue as to some material fact," that is, a fact that could "affect the suit's outcome." López-Ramírez, 32 F.4th at 97 (quoting Cortés-Irizarry v. Corporación Insular De Seguros, 111 F.3d 184, 187 (1st Cir. 1997)). While we take the record in the light most favorable to González, she cannot "rely on an absence of competent evidence, but must affirmatively point to specific facts that demonstrate the existence of an

---

[11] Despite her half-hearted arguments that the district court's reliability analysis was wrong, González spills the most ink to argue the district court erred in excluding the report for violating Rule 26, largely that exclusion was "too severe" a sanction. We have considered her arguments, but we need not address them any further. See López-Ramírez, 32 F.4th at 94 n.5 (declining to consider argument that exclusion under Rule 26 was "too severe of a sanction" when Rule 702 and Daubert provided independent basis for exclusion).

- 21 -

authentic dispute." Feliciano-Muñoz v. Rebarber-Ocasio, 970 F.3d 53, 62 (1st Cir. 2020) (quoting McCarthy v. Nw. Airlines, Inc., 56 F.3d 313, 315 (1st Cir. 1995)); see also Garcia-Garcia, 878 F.3d at 417.

As we explained, and as González does not dispute, given the nature of her claim she needs an expert to establish elements of her negligence cause of action (i.e., causation). See Martínez-Serrano, 568 F.3d at 286. But since we affirm the exclusion of Dr. Schifrin's testimony, González can't rely on any of it to withstand the summary judgment sickle. See Garside v. Osco Drug, Inc., 895 F.2d 46, 50 (1st Cir. 1990) (explaining that inadmissible expert evidence can't be used to defeat summary judgment). So, without Dr. Schifrin, González is left arguing only that her case survives summary judgment because she could make it at trial relying on the Hospital's expert, Dr. Gaudier, and other unnamed "opposing witnesses" to prove causation. González appears to argue that the mere existence of an admissible expert is enough to surpass the summary judgment blade. Unfortunately for González, that's not how it works -- González does not, as she must, point to any specific finding in Dr. Gaudier's report to support her claim, or any other admissible evidence to boot.[12] See Feliciano-Muñoz, 970 F.3d at 62.

---

[12] Our own dive into Dr. Gaudier's report confirms that conclusion. In fact, it would wreck González's case. As to the

Thus, we affirm the district court's grant of summary judgment.

## Motion for Reconsideration

Last, we take on González's challenge to the district court's order denying her motion for reconsideration (brought as a Rule 59(e) motion). She contends that the court wrongly concluded it had lost jurisdiction over the case (and thus, her motion too) when she filed her first notice of appeal. She insists that the court should have instead considered the motion, in part because it included Dr. Schifrin's newly amended expert report.

Bear with us for a brief play-by-play. González filed a motion for reconsideration days after the district court entered judgment. With it, she attached for the first time an amended expert report from Dr. Schifrin, urging the district court to take it into account. While that motion was pending, González filed her first notice of appeal of the judgment. The district court subsequently denied the motion. While González offered a few bases for reconsideration, which we'll address shortly, the court gave one reason for denying it -- that after the notice of appeal, it no longer had jurisdiction over the case. González then filed a so-called "Amended Notice of Appeal," which states, like her first

monitoring strips, for example, Dr. Gaudier reviewed strips up until 11:27 AM and concluded they were "reassuring" and there was "absolutely no indication" for continuous monitoring of ALG.

- 23 -

notice, that she "appeals . . . the Judgment" of the district court.[13]

We begin with the district court's conclusion that it lost jurisdiction over the case, and over the Rule 59(e) motion too, when González filed her first notice of appeal. We review the district court's denial of a Rule 59(e) motion for abuse of discretion. Biltcliffe v. CitiMortgage, Inc., 772 F.3d 925, 930 (1st Cir. 2014). "A Rule 59(e) motion briefly suspends finality" of a judgment so the district court can "fix any mistakes and thereby perfect its judgment before a possible appeal." Banister v. Davis, 140 S. Ct. 1698, 1708 (2020). In line with that principle, even after González filed her notice of appeal, the district court legally maintained jurisdiction then to resolve her Rule 59(e) motion on the merits. And Federal Rule of Appellate Procedure 4(a)(4)(B)(i) specifically provides district courts with jurisdiction to rule on pending motions for reconsideration *after* a litigant files her notice of appeal, explaining that the notice "becomes effective" once the district court resolves that motion. See also Fed. R. App. P. 4(a)(4)(A)(i)-(vi) (listing post-judgment motions that fall under this Rule, including Rule 59(e) motions);

_____

[13] The parties dispute whether we have jurisdiction to review the motion for reconsideration. Because "the merits are easily resolved in favor of the party who would benefit from a finding that jurisdiction is wanting," we assume jurisdiction. Caribbean Mgmt. Grp., Inc. v. Erikon LLC, 966 F.3d 35, 41-42 (1st Cir. 2020) (citations omitted).

- 24 -

Fontanillas-Lopez v. Morell Bauzá Cartagena & Dapena, LLC, 832 F.3d 50, 62 n.10 (1st Cir. 2016) (explaining same and that Rule 4(a)(4)(B)(i) is an exception to the principle that filing a notice of appeal usually "divests" the district court of jurisdiction over the case (quoting Griggs v. Provident Consumer Disc. Co., 459 U.S. 56, 58 (1982) (per curiam))). Thus, the district court erroneously denied González's motion on jurisdictional grounds. But our work does not end there. As we explain next, González has made no showing that she is entitled to relief under Rule 59(e), so we still affirm the denial of her motion, albeit for a different reason than the district court. See Fisher v. Kadant, Inc., 589 F.3d 505, 512 (1st Cir. 2009) (affirming post-judgment ruling "on an alternate ground that is evident in the record," "in lieu of remanding," despite district court's legal error in disposing of the motion).

To obtain Rule 59(e) relief, "the movant must demonstrate either that newly discovered evidence (not previously available) has come to light or that the rendering court committed a manifest error of law." Palmer v. Champion Mortg., 465 F.3d 24, 30 (1st Cir. 2006). And "a party moving for Rule 59(e) relief may not repeat arguments previously made during summary judgment, nor may it present new arguments on a Rule 59(e) if such arguments could, and should, have been made before judgment issued." Markel Am. Ins. Co. v. Diaz-Santiago, 674 F.3d 21, 32 (1st Cir. 2012)

(internal quotation marks and citation omitted). With this exacting standard in mind, we need not linger. Here, González's Rule 59(e) motion regurgitates many of the same arguments put forth in her summary judgment briefing. She argues -- by citing to the same cases as before -- that preclusion of her expert is too severe a sanction under the circumstances and that even without her expert, she could still prevail at trial by relying upon the Hospital's expert. The district court rejected these contentions, and so have we. González's only "new" argument centers on Dr. Schifrin's amended expert report, which she argues explains the Hospital's withholding of the monitoring strips and fills any gaps in Dr. Schifrin's prior report. There is a significant problem with that contention, however. González introduced the amended report for the first time with her Rule 59(e) motion, and the report was authored after the district court entered judgment and dismissed her case, despite Dr. Schifrin's deposition occurring several years prior, and the court's grant of the motion in limine one year prior. Thus, Dr. Schifrin's amended report is not newly discovered evidence, rather Dr. Schifrin could have filed it any time after his 2018 deposition when he was shown the monitoring strips, as he said he'd do during the deposition.

Because González has made no showing that she is entitled to Rule 59(e) relief, we affirm the denial of her motion.

## CONCLUSION

With that, we **affirm** the district court's grant of the Hospital's motion in limine and motion for summary judgment, and its denial of the motion for reconsideration. Each side shall bear its own costs.