# United States Court of Appeals
## For the First Circuit

No. 22-1776

LOURDES RIVERA RODRÍGUEZ; MARIA DE LOS ANGELES RAMOS RODRÍGUEZ; and RAFAEL PACHECO RODRÍGUEZ,

Plaintiffs, Appellants,

v.

HOSPITAL SAN CRISTOBAL, INC.; QUALITY HEALTH SERVICES OF PUERTO RICO, INC.; IRIS VÉLEZ GARCÍA; ZACARÍAS A. MATEO MINAYA; BERRIS CASTILLO; and CONJUGAL PARTNERSHIP MATEO-CASTILLO,

Defendants, Appellees,

FUNDACIÓN SAN CRISTOBAL, INC.; JOHN DOE; CONJUGAL PARTNERSHIP DOE-VÉLEZ; CORPORATIONS A, B, AND C; and UNKNOWN INSURANCE COMPANY,

Defendants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Pedro A. Delgado-Hernández, U.S. District Judge]

Before

Barron, Chief Judge,
Lipez and Montecalvo, Circuit Judges.

David Efron, with whom Law Offices of David Efron, P.C. was on brief, for appellants.
Jose Hector Vivas, with whom Vivas & Vivas was on brief, for appellees Hospital San Cristobal, Inc., and Quality Health Services of Puerto Rico, Inc.

José A. González Villamil, with whom Bufete González Villamil C.S.P. was on brief, for appellees Zacarías A. Mateo Minaya, Berris Castillo, and the Mateo-Castillo conjugal partnership.

Roberto Ruiz Comas and RC Legal & Litigation Services PSC for appellee Iris Vélez García.

———————————

January 19, 2024

———————————

**BARRON**, <u>Chief Judge.</u> Lourdes Rivera Rodríguez, Maria de Los Angeles Ramos Rodríguez, and Rafael Pacheco Rodríguez (collectively, "the plaintiffs") appeal from the grant of summary judgment against them in this medical malpractice suit. They brought the suit in the United States District Court for the District of Puerto Rico after their mother, Ramona Rodríguez Rivera ("Rodríguez"), passed away while in the care of Hospital San Cristobal ("HSC"). The suit seeks to recover under Puerto Rico law for the allegedly negligent care that Rodríguez received at HSC during and following an abdominal surgery performed by Dr. Iris Vélez García ("Dr. Vélez") and Dr. Zacarías A. Mateo Minaya ("Dr. Mateo"). We affirm.

**I.**

**A.**

We begin with a recitation of the undisputed facts and relevant procedural history.[1]

On February 29, 2016, Rodríguez visited HSC complaining of pelvic pain. Rodríguez -- who was then seventy-one years old and living with several chronic health conditions including hypertension, type 2 diabetes, and asthma -- was examined by Dr.

---

[1] Unless otherwise specified, all quotations in this section are drawn from reports prepared by the parties' proffered expert witnesses summarizing the medical records from Rodríguez's visits to HSC.

Vélez, who had been her regular gynecologist since 2005. Dr. Vélez recommended that Rodríguez undergo a bilateral oophorectomy via laparotomy after a pelvic ultrasound revealed a "complex cystic mass" near Rodríguez's right ovary.

Dr. Vélez performed Rodríguez's surgery on April 21, 2016, at HSC. During the surgery, Dr. Vélez discovered that Rodríguez had a "frozen pelvis" with multiple "intraabdominal adhesions," and so she requested a surgical consultation from Dr. Mateo, another gynecologist on HSC's staff. Dr. Mateo assisted Dr. Vélez with Rodríguez's surgery. On April 25, 2016, Rodríguez was discharged from HSC after HSC staff observed "positive bowel sounds" and Rodríguez reported "positive stool passage."

Four days later, on April 29, during a scheduled postoperative appointment with Dr. Vélez at HSC, Rodríguez reported that she had been experiencing "nausea, vomiting, and abdominal/pelvic pain since April 26." Rodríguez was then admitted to HSC's emergency department and was diagnosed with a presumed perforated sigmoid colon. Later that day, Rodríguez underwent an emergency exploratory laparotomy to address her presumed perforated colon, during which Dr. Vélez, Dr. Mateo, and one Dr. Ortiz Rosado[2] performed a "partial colectomy with Hartman[n] pouch, end colostomy[,] and subtotal hysterectomy." Rodríguez was

---

[2]    Dr. Ortiz Rosado is not a party to this suit.

subsequently admitted to HSC's intensive care unit ("ICU") in critical condition. She was intubated on a respirator with a nasogastric ("NG") tube, a colostomy bag, and a Foley catheter.

In HSC's ICU, Rodríguez received care from various specialists, including Dr. Vélez and staff from HSC's "general surgery, internal medicine, infectious disease, cardiology, pulmonology, nephrology, hematology/oncology, and ENT" departments. Two days after her admission to the ICU, on May 1, Rodríguez was diagnosed with "bacteremia/sepsis." Then, on May 4, Rodríguez tested positive for pseudomonas bacteria, at which point HSC's "infection control program became involved" with her care. HSC's epidemiology department recommended several specific disinfection protocols to treat Rodríguez's pseudomonas infection, but "[t]here is no documentation that these recommendations were carried out at any time."

On May 6, HSC staff discovered that Rodríguez's stoma had become necrotic. Rodríguez consequently underwent a third surgical procedure consisting of "an exploratory laparotomy, ileal resection, transverse colon loop colostomy, enterography, and enteroclysis." Dr. Vélez and Dr. Ortiz Rosado performed this third surgery. Rodríguez was then returned to the ICU, where she continued to receive care from HSC staff.

On May 12, nursing and infectious-disease staff noted "the presence of worms and/or maggots in the right nostril of

- 3 -

[Rodríguez], where the NG tube was located." A CT scan of Rodríguez's sinuses was ordered, but there was otherwise "little to no documentation of [any] consultations regarding the presence of worms nor any analysis of the source of these worms."

On May 15, it was "documented that [Rodríguez's] fecal collector [was] out of place." The following day, HSC staff noted that the fecal collector "continue[d] to be displaced and that there [was] abundant fecal material around the site [of the fecal collector] as well as coming from" an "open wound" near the site.

On May 18, two types of bacteria were detected in cultures of fluid taken from Rodríguez's abdomen. That same day, HSC staff noted that Rodríguez was "no longer responding to verbal or physical stimuli." By the following afternoon, HSC staff determined that Rodríguez could not undergo a planned fourth procedure "due to worsening of her condition," and they obtained a "Do Not Resuscitate" order from Rodríguez's family. Rodríguez died later that evening, at 8:48 P.M. on May 19, 2016.

An autopsy determined that Rodríguez's cause of death was "peritonitis due to sigmoid colon perforation with associated sepsis and septic shock. Complicating factors were congestive heart failure, bilateral bronchopneumonia, and diabetic ketoacidosis." The autopsy also showed "multiple pressure ulcers" on Rodríguez's body.

The plaintiffs filed suit in the District Court on May 11, 2018. The operative complaint named as defendants Quality Health Services of Puerto Rico, Inc., doing business as HSC ("Quality Health/HSC"); Dr. Vélez; Dr. Mateo; Dr. Mateo's wife, Berris Castillo; the Mateo-Castillo conjugal partnership; and several other individuals and corporations "whose identities [were] unknown, [but who] by their negligent acts or omissions caused or contributed to the damages claimed."[3]

The operative complaint asserted that "[HSC] and [its] personnel, including [Dr. Vélez] and [Dr. Mateo], were practicing below the standard of care in the treatment" that they provided to Rodríguez, and that Rodríguez's "premature death . . . was caused by the negligent management of her condition." The complaint alleged several departures from "medical standards" and instances of "professional negligence" in the defendants' care of Rodríguez which "include[d], but [were] not limited to":

> failure to recognize, appropriately asses[s] and repair damage to any organs involved in or near the operative field prior to closing the abdomen; failure to recognize that Mrs. Rodríguez's sigmoid colon was damaged in this circumstance and to perform an appropriate repair procedure to assure sigmoid colon integrity before abdominal closure; failure in the proper management of hygiene by the

---

[3] The plaintiffs also named as a defendant, but later voluntarily dismissed, Fundación San Cristobal, Inc.

> hospital staff in the care of Mrs. Rodríguez; failure in the documentation of the findings; failure to manage the infectious processes suffered by the patient; failure to manage the patient's pre-existing condition of diabetes which likely exacerbated her condition and accelerated her demise; failure to timely correct the displacement of the fecal collector[;] and failure to manage the patient's care by presenting multiple pressure ulcers at autopsy due to the fact that apparently the staff did not make changes in the patient's position in the required time.

The plaintiffs claimed that these alleged deficiencies in the care provided to Rodríguez made the defendants liable for negligence under Puerto Rico law. See P.R. Laws tit. 31, §§ 5141, 5142. The plaintiffs sought $3 million in damages for pain and suffering.

## C.

To establish a prima facie case of negligence under Puerto Rico law, "a plaintiff must establish (1) the duty owed (i.e., the minimum standard of professional knowledge and skill required in the relevant circumstances), (2) an act or omission transgressing that duty, and (3) a sufficient causal nexus between the breach and the claimed harm." Cortéz-Irizarry v. Corporación Insular de Seguros, 111 F.3d 184, 189 (1st Cir. 1997). In cases of alleged medical malpractice, "Puerto Rico holds health care professionals to a national standard of care." Id. at 190.

Under Puerto Rico law, "physicians are protected by a presumption to the effect that they have exercised a reasonable degree of care and the treatment provided was adequate." López

- 6 -

Delgado v. Cañizares, 163 P.R. Dec. 119 (2004) (certified translation at Appellant's App. 247). Thus, "[a] physician's negligence is not presumed from the fact that a patient suffered damages or the treatment was unsuccessful." Id. Instead, to establish "a breach of a physician's duty of care," a plaintiff "ordinarily must adduce expert testimony to limn the minimum acceptable standard and confirm the defendant doctor's failure to meet it." Cortéz-Irizarry, 111 F.3d at 190.

In preparation for trial, the District Court ordered the parties to submit a joint pretrial conference memorandum outlining the contours of the case and the evidence that they would present at trial. The plaintiffs indicated in the memorandum that they would rely on the testimony of an expert witness, Dr. Jason S. James ("Dr. James"), to establish the defendants' negligence. The plaintiffs asserted that Dr. James would

> testify as a medical expert in obstetrics, gynecology[,] and general medicine about his professional qualifications, his review of the medical records in this case, the applicable medical standards, his expert report and deposition testimony, the reports of defendants' experts, his professional opinion as to the departures from the medical standards by defendants in the treatment provided to [Rodríguez] and their causal relationship with [Rodríguez's] injuries and premature death[,] and about any applicable medical literature in support of his opinion.

The plaintiffs also "reserve[d] the right to use as their own any expert witness announced by the defendants."

- 7 -

Dr. Vélez and Dr. Mateo represented that they would each call an expert witness of their own, and Quality Health/HSC represented that it would call its own expert witness as well. Dr. Vélez represented that her expert, Dr. Adrián Colón Laracuente, would testify as to Dr. Vélez's treatment of Rodríguez "from the gynecological and surgical standpoint . . . and her compliance with the standard of care." Dr. Mateo represented that his expert, gynecological specialist Dr. Alfredo S. Colón Martínez, would testify "regarding his opinion that Dr. Mateo complied with all the applicable medical standards while providing assistance during the two surgical interventions to [Rodríguez] in which his assistance was requested." Quality Health/HSC represented that its expert, internist Dr. Anibelle Altieri Ramirez, would testify as to "the standard of care applicable to this case, the correctness of the treatment given to" Rodríguez by HSC staff, "and that such treatment did not cause [the] plaintiff[s'] damages."

Following a pretrial conference, the District Court referred the case to a magistrate judge for mediation. Mediation was unsuccessful, in part because the defendants represented at the settlement conference that they intended to file motions in limine, the resolution of which had the potential to affect the parties' settlement efforts.

Two separate motions in limine were filed -- one by Quality Health/HSC and the other by Dr. Mateo, Berris Castillo, and the Mateo-Castillo conjugal partnership, joined by Dr. Vélez. The motions sought to exclude the expert opinion testimony of the plaintiffs' expert, Dr. James. Both motions argued that Dr. James's testimony must be excluded because his expert report did not comply with Federal Rule of Civil Procedure 26(a) and because, even if the report did, the plaintiffs had not met their burden under Federal Rule of Evidence 702 to show that his testimony was admissible.

Federal Rule of Civil Procedure 26 requires parties in civil cases to disclose their witnesses. Rule 26(a)(2)(B) requires that the disclosure of any witness "retained or specially employed to provide expert testimony" include a written report prepared and signed by the expert witness which "must contain," among other requirements, "a complete statement of all opinions the witness will express and the basis and reasons for them." Rule 26(e)(2) then requires that the proponent of an expert witness "supplement" their initial disclosure to alert opposing parties to any subsequent "additions or changes" to the content of the expert's testimony. Federal Rule of Civil Procedure 37(c)(1), meanwhile, provides that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence

on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."

Federal Rule of Evidence 702 governs the admissibility of expert opinion testimony. It provides that a qualified expert witness "may testify in the form of an opinion or otherwise" only if the party seeking to introduce the witness's testimony demonstrates by a preponderance of the evidence that (a) the witness's "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue"; (b) "the testimony is based on sufficient facts or data"; (c) "the testimony is the product of reliable principles and methods"; and (d) "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702.

Dr. James's expert report first summarized his qualifications as a licensed physician and gynecological specialist "well versed in the current standards of care applicable to the practice of obstetrics and gynecology." Dr. James's report stated that, "[i]n this matter, [his] opinions [were] based on [certain enumerated] medical records and documents . . . and on reliable and accepted scientific principles to a reasonable degree of medical certainty." The report next stated that Dr. James had reviewed the hospital records associated with Rodríguez's stays at HSC between April 21 and April 25, 2016, and between April 29 and

- 10 -

May 19, 2016, as well as Dr. Vélez's office records pertaining to her care of Rodríguez since 2005. The report then recited the facts of Rodríguez's case and closed with Dr. James's "Comment" on the case. In that "Comment" section, Dr. James wrote:

> Based on the medical documents submitted, it appears that [Rodríguez] expired from sepsis and septic shock, a condition caused by the perforated sigmoid colon that occurred in the initial surgery on April 21, 2016 performed by Dr. [Vélez] and Dr. [Mateo]. This patient encountered several organisms throughout her various organ systems: Klebsiella pneumonia, Pseudomonas aeruginosa, and Enterococcus faecalis in the blood, in the inguinal and perianal secretions, in the urine, in the colostomy, and in the throat, as noted in the autopsy report. In addition, the most surprising finding was the worms and/or maggots that were noted to be present in the nostril of the patient where the NG tube was placed. There is little room for doubt regarding the inappropriate nature and poor hygiene which was utilized by the hospital personnel in caring for [Rodríguez]. There is poor documentation regarding this unusual discovery and no evidence that appropriate precautions were taken to prevent this occurrence or to remedy the situation once it was realized. There is no evidence of appropriate disinfection of the hospital room, equipment, hospital staff, and the patient herself as recommended by infectious disease and epidemiology. In addition, there appears to be poor management of [Rodríguez's] medical comorbidities, such as inadequate care for her diabetes which likely exacerbated her condition and accelerated her demise. It appears that her fecal collector remained out of place for more than 24 hours after discovering it had become dislodged, allowing fecal material to contaminate the stoma as well as the open wound itself. Further, there is evidence on autopsy of multiple pressure

> ulcers, which lends further evidence of the substandard care that [Rodríguez] received during her admission at [HSC].

> In conclusion, it is my opinion -- based upon a reasonable degree of medical certainty -- that in the case discussed above there were numerous deviations, failures, and departures from acceptable standards of care on the part of Dr. [Vélez], Dr. Mateo, as well as on the part of [HSC] and its staff.

In their motions to exclude Dr. James's expert testimony under Rule 26, the defendants argued that Dr. James's expert report "fail[ed] to state the totality of his opinions in this case . . . considering the scope of the testimony stated in the Pretrial Report and which [the p]laintiffs apparently intend[ed] to present at trial." The defendants further contended that the report "[did] not state the applicable standards of care; [did] not specify whether the standards of care are applicable on a national basis; [did] not state how the applicable standards were specifically breached"; did not explain how the defendants' "alleged negligence caused and/or contributed to [Rodríguez's] condition and demise"; and was "conspicuously lacking in reference or citations to medical literature." Accordingly, the defendants argued that Dr. James's testimony had to be excluded under Rule 37(c).

Alternatively, the defendants argued that Dr. James's testimony should be "excluded as speculative" under Federal Rule of Evidence 702. They contended that was so because Dr. James's expert report did not articulate either a "[s]cientifically

- 12 -

acceptable methodology" or "the bases and foundations that underlie [his] expert opinion" and because nothing else in the record enabled the plaintiffs to meet their burden to show that his testimony was admissible under Rule 702.

The plaintiffs opposed the defendants' motions to exclude Dr. James's testimony. The plaintiffs did not request, however, that the District Court hold a hearing on the merits of the motions at which Dr. James could testify. Nor did they request leave to supplement Dr. James's expert report. Instead, the plaintiffs argued that the entirety of Dr. James's proposed testimony was admissible based on the expert report itself.

The District Court granted the defendants' motions to exclude Dr. James's testimony. In so ruling, the District Court relied entirely on Federal Rule of Evidence 702.

As to Dr. Vélez's and Dr. Mateo's motion under Rule 702 to exclude Dr. James's testimony, the District Court reasoned that Dr. James's expert report "conclude[d] as a matter of fact that Dr. Vélez and Dr. Mateo 'perforated' [Rodríguez's] sigmoid colon during the first surgery on April 21, 2016" but provided "no explanation" for that conclusion, instead "seemingly assum[ing] that Dr. Vélez and Dr. Mateo did so because [Rodríguez] returned to [HSC] complaining of pelvic pain some days after being discharged" and was found to have had a perforated sigmoid colon at that time. The District Court held that that assumption was

"not enough for a finding that Dr. Vélez and Dr. Mateo perforated the colon." The District Court further observed that although Dr. James "conclude[d that] Dr. Vélez and Dr. Mateo deviated from acceptable standards of care," his report did not "state what those standards are, nor where they come from[, nor] how Dr. Vélez and Dr. Mateo deviated from them."

As to Quality Health/HSC's motion under Rule 702 to exclude Dr. James's testimony, the District Court concluded that Dr. James's opinions regarding the alleged negligence of HSC staff "fare[d] no better" than his opinions regarding the alleged negligence of Drs. Mateo and Vélez. And that was so, the District Court explained, even though the report pointed to several alleged departures from acceptable standards of care, because "nowhere in [his] report [did] Dr. James identify the standard of care that [HSC's] hospital staff should have adhered to; where that standard comes from; and how the staff deviated from that standard."

At the same time that the District Court granted the defendants' motions to exclude Dr. James's testimony under Rule 702, the District Court also granted the defendants' requested leave to move for summary judgment within ten days. Dr. Mateo, Berris Castillo, and the Mateo-Castillo conjugal partnership moved for summary judgment seven days later, which motion Dr. Vélez joined; Quality Health/HSC filed its own motion for summary judgment two days later.

The plaintiffs opposed both motions for summary judgment, arguing that even if Dr. James's testimony were excluded, they could rely on the testimony of the defendants' expert witnesses to prove their case. In the alternative, the plaintiffs asked the District Court to reconsider its ruling excluding Dr. James's expert testimony, as they contended that the defendants were not entitled to summary judgment if Dr. James's testimony were not excluded.

The District Court denied the plaintiffs' request for reconsideration, granted the defendants' motions for summary judgment, dismissed the plaintiffs' claims with prejudice, and entered judgment in favor of the defendants. The plaintiffs timely appealed the District Court's entry of summary judgment.

## II.

We first address the plaintiffs' challenge to the District Court's grant of summary judgment to Dr. Vélez and Dr. Mateo. "'To defeat a motion for summary judgment, the nonmoving party must demonstrate the existence of a trialworthy issue as to some material fact,' i.e., a fact that 'potentially could affect the suit's outcome.'" López-Ramírez v. Toledo-González, 32 F.4th 87, 97 (1st Cir. 2022) (quoting Cortéz-Irizarry, 111 F.3d at 187). To make this showing, a plaintiff "must affirmatively point to specific facts that demonstrate the existence of an authentic dispute." Feliciano-Muñoz v. Rebarber-Ocasio, 970 F.3d 53, 62

- 15 -

(1st Cir. 2020) (quoting McCarthy v. Nw. Airlines, Inc., 56 F.3d 313, 315 (1st Cir. 1995)).  Our review of the summary judgment ruling here is de novo.  See Milward v. Rust-Oleum Corp. (Milward II), 820 F.3d 469, 472-73 (1st Cir. 2016).

The District Court based its ruling that Drs. Mateo and Vélez were entitled to summary judgment in part on its decision to exclude Dr. James's expert testimony under Rule 702.  The plaintiffs now contend that this Rule 702 ruling was in error.  The plaintiffs do not suggest in advancing that contention, however, that they can meet their burden to show that Dr. James's testimony is admissible under Rule 702 based on anything extrinsic to his expert report.[4]  The plaintiffs simply contend based on the report itself that the District Court abused its discretion in ruling that the plaintiffs had failed to meet that burden.[5]  The plaintiffs then go on to contend, in the alternative, that we must

---

[4]    The plaintiffs assert as part of their challenge to the District Court's Rule 702 ruling that the District Court's decision to exclude Dr. James's report altogether after finding it deficient was "too extreme of a sanction" -- but they conceded at oral argument that they never requested leave to amend Dr. James's expert report to cure its alleged deficiencies, and they point to no authority suggesting that the District Court should have sua sponte granted them leave to do so before excluding the testimony.

[5]    Although the plaintiffs argue that the District Court erred by not holding a Daubert hearing on the admissibility of Dr. James's testimony before granting the defendants' motions in limine to exclude it, the contention fails for the same reasons we rejected a similar contention in González-Arroyo v. Doctors' Center Hospital Bayamón, Inc., 54 F.4th 7, 15 (1st Cir. 2022).

overturn the summary judgment ruling even if the District Court's Rule 702 determination was not error. And that is so, they contend, because of evidence in the record that is independent of Dr. James's testimony. For the reasons set forth below, we conclude that the plaintiffs' grounds for challenging the summary judgment ruling have no merit.

**A.**

To assess the plaintiffs' challenge to the summary judgment ruling at issue, it helps to focus first on the aspect of that challenge that concerns the District Court's ruling excluding Dr. James's testimony under Rule 702. To do so, we begin by reviewing the requirements that Rule 702 sets forth before then turning back to the District Court's Rule 702 ruling. With that foundation in place, we then will be well-positioned to explain why the plaintiffs' challenge to the grant of summary judgment to Dr. Vélez and Dr. Mateo fails.

**1.**

Rule 702 provides in full that:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:

**(a)** the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

**(b)** the testimony is based on sufficient facts or data;

**(c)** the testimony is the product of reliable principles and methods; and

**(d)** the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.[6]

Rule 702, in its present form, incorporates the reasoning of the Supreme Court of the United States in <u>Daubert</u> v. <u>Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993). <u>See</u> Fed. R. Evid. 702 advisory committee's notes to 2000 amendment. There, the Court construed an earlier version of the rule and explained that it assigns a "gatekeeping role for the judge" to determine whether "an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." <u>Daubert</u>, 509 U.S. at 597.

As a result, the present version of Rule 702 "affirms the trial court's role as gatekeeper and provides some general standards that the trial court must use to assess the reliability and helpfulness of proffered expert testimony." Fed. R. Evid. 702 advisory committee's notes to 2000 amendment. To that end, the present version of the rule establishes that expert testimony may

---

[6]    This is the current version of Rule 702, which went into effect on December 1, 2023. <u>See</u> Fed. R. Evid. 702 advisory committee's notes to 2023 amendment. However, the application of the rule to this case is not affected by the 2023 changes. <u>See</u> Fed. R. Evid. 702 (2011) (amended 2023).

be admitted into evidence only if it is "based on sufficient facts or data," is "the product of reliable principles and methods," and "reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702.

Moreover, in applying Rule 702, we continue to draw on Daubert's reasoning. See, e.g., Milward v. Acuity Specialty Prods. Grp., Inc., (Milward I), 639 F.3d 11, 14 (1st Cir. 2011). Thus, "[t]he focus" of the inquiry into the admissibility of expert testimony under Rule 702 "must be solely on principles and methodology, not on the conclusions that they generate." Daubert, 509 U.S. at 595. This distinction means that "[w]hen the factual underpinning of an expert's opinion is weak, it is a matter affecting the weight and credibility of the testimony" and thus "a question to be resolved by the jury." Milward I, 639 F.3d at 22 (citation omitted).

At the same time, "nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert." Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997). Indeed, Daubert made clear that to be admissible under Rule 702, an expert's opinion "must be supported by appropriate validation" and rest on "more than subjective belief or unsupported speculation." 509 U.S. at 590. Thus, in assessing whether the expert opinion has the requisite validation for

- 19 -

purposes of Rule 702, a court may conclude that it does not because, given the record at hand, "there is simply too great an analytical gap between the data and the opinion proffered." Joiner, 522 U.S. at 146.

We note that "[t]he party seeking to introduce the evidence has the burden of establishing both its reliability and its relevance," Milward II, 820 F.3d at 473 (citing Daubert, 509 U.S. at 593 n.10), and that we review a district court's ruling on the admissibility of expert testimony under Rule 702 for abuse of discretion, assessing "[p]redicate factual findings" for "clear error" and "pure questions of law . . . de novo," id. at 472.

**2.**

In its ruling under Rule 702 concerning Dr. James's testimony, the District Court explained that Dr. James's expert report asserted two opinions about the alleged negligence of Drs. Mateo and Vélez: that "Dr. Vélez and Dr. Mateo 'perforated' [Rodríguez's] sigmoid colon during the first surgery on April 21, 2016," and that "Dr. Vélez and Dr. Mateo deviated from acceptable standards of care" in their treatment of Rodríguez. The District Court then determined that Dr. James's testimony setting forth those two opinions was inadmissible under Rule 702, excluding on that basis the entirety of Dr. James's testimony as to Dr. Vélez and Dr. Mateo.

Notably, by excluding all of Dr. James's expert testimony as to those two defendants, the District Court excluded Dr. James's testimony concerning his opinion that, "[b]ased on the medical documents submitted, it appears that [Rodríguez] expired from sepsis and septic shock, a condition caused by the perforated sigmoid colon that occurred in the initial surgery on April 21, 2016 performed by [Dr. Vélez and Dr. Mateo]." The District Court appears to have done so because it treated Dr. James's opinion in that regard as if it were a "conclu[sion] as a matter of fact that Dr. Vélez and Dr. Mateo 'perforated'" Rodríguez's sigmoid colon during the April 21 surgery. Rivera Rodríguez v. Quality Health Servs. P.R., Civ. No. 18-1287 (PAD), 2022 WL 3445348, at *4 (D.P.R. Aug. 4, 2022).

To support that aspect of the Rule 702 determination, the District Court explained that "Dr. James seemingly assume[d] that Dr. Vélez and Dr. Mateo [perforated Rodríguez's colon] because [Rodríguez] returned to [HSC] complaining of pelvic pain some days after being discharged from her first surgery [and] it was ultimately discovered that she had a perforated colon." Id. But, the District Court explained, such an assumption was "not enough [to support] a finding that Dr. Vélez and Dr. Mateo perforated the colon[.]" Id. The District Court then supported that determination in a footnote by stating that "Dr. James's conclusion [was] contradicted by the medical record" because, several days

- 21 -

after the April 21 surgery, on "April 25, 2016, [Rodríguez] was tolerating a regular diet and passing flatus and stool normally and was deemed ready for discharge."  Id. at *4 n.3.  Yet, the District Court reasoned, Dr. James "inexplicably state[d] that Dr. Vélez and Dr. Mateo perforated [Rodríguez's] colon" on April 21. Id.

There is some force to the plaintiffs' contention that the District Court erred in this aspect of its ruling under Rule 702 because it wrongly based the ruling on its own assessment of the "factual underpinning" of the opinion by Dr. James that was excluded.  Daubert, 509 U.S. at 595.  As Daubert makes clear, questions about the strength of "the factual underpinning of an expert's opinion" are "matter[s] affecting the weight and credibility of the testimony" and therefore "a question to be resolved by the jury."  Id.

Moreover, the District Court appears to have understood that Dr. James's testimony would set forth the opinion that Dr. Vélez and Dr. Mateo perforated the colon during the surgery on April 21, rather than merely that the colon was perforated during that surgery.  While the District Court explained its reasons for concluding that testimony by Dr. James that those defendants perforated the colon at that time was not admissible under Rule 702, it gave no reason for concluding that Rule 702 barred Dr. James from simply testifying that the colon was perforated then,

- 22 -

without explicitly attributing the act of perforation to either of those defendants.

Dr. James's expert report, however, opines only that the perforation of Rodríguez's sigmoid colon occurred in the initial surgery on April 21. It does not assert at any point that the perforation occurred due to any action that either Dr. Mateo or Dr. Vélez took at that time -- or, for that matter, at any other time. Indeed, in that respect, the report accords with the plaintiffs' operative complaint, which also does not allege at any point that Dr. Vélez or Dr. Mateo acted negligently by perforating Rodríguez's colon. Instead, the operative complaint alleges that their negligence lay in their "failure to recognize, appropriately assess and repair damage to any organs involved in or near the operative field prior to closing the abdomen" and their "failure to recognize that [Rodríguez's] sigmoid colon was damaged in this circumstance and to perform an appropriate repair procedure to assure sigmoid colon integrity before abdominal closure."

Despite these potential problems with the District Court's analysis of the admissibility of this specific portion of Dr. James's expert testimony under Rule 702, we reject the plaintiffs' separate contention that the District Court abused its discretion in excluding Dr. James's broad conclusion that "Dr. Vélez and Dr. Mateo deviated from acceptable standards of care" in their treatment of Rodríguez. With respect to that aspect of the

- 23 -

District Court's ruling under Rule 702, Dr. James's report identifies no national standard of care against which those defendants' assertedly negligent acts or omissions could be measured by the trier of fact. There also is no other basis in the record for concluding by a preponderance of the evidence that Dr. James's opinion that Dr. Vélez and Dr. Mateo acted negligently is "the product of reliable principles and methods." Fed. R. Evid. 702(c). We thus agree with Dr. Vélez and Dr. Mateo that the District Court correctly concluded that Dr. James's opinion that "Dr. Vélez and Dr. Mateo deviated from acceptable standards of care" in their treatment of Rodríguez could "only be construed as one based on a res ipsa loquitur inference, an inference insufficient to withstand scrutiny in this setting." Rivera Rodríguez, 2022 WL 3445348, at *4 (citing López-Ramírez v. Grupo Hima San Pablo, Inc., Civ. No. 16-3192 (RAM), 2020 WL 365554, at *5 (D.P.R. Jan. 22, 2020) ("[I]n the context of determining the admissibility of expert testimony, proffered testimony that consists solely of a res ipsa loquitur opinion would lack the reliable methodology and specialized information required by Fed. R. Evid. 702."), aff'd López-Ramírez, 32 F.4th 87).

The question that now remains, with respect to the plaintiffs' challenge to the grant of summary judgment to Dr. Vélez and Dr. Mateo, is whether that challenge has merit, given that the District Court properly excluded Dr. James's conclusion that Drs.

- 24 -

Vélez and Mateo deviated from acceptable standards of care. As we will next explain, we conclude that the answer is that the challenge has none.

**3.**

To be sure, as we have explained, it may be that testimony from Dr. James that Rodríguez's colon was perforated during the April 21 surgery was wrongly excluded under Rule 702. But even if we were to assume as much, there still would be no basis in the record from which a reasonable juror could conclude that Dr. Vélez and Dr. Mateo were negligent as alleged, given that the District Court did not err in excluding Dr. James's testimony that "Dr. Vélez and Dr. Mateo deviated from acceptable standards of care" in their treatment of Rodríguez.

We recognize that the plaintiffs do contend that the District Court's grant of summary judgment was in error because, even without Dr. James's opinion as to Dr. Vélez's and Dr. Mateo's negligence, the plaintiffs could have relied at trial on the testimony of the defendants' expert witnesses to "help the jury to determine both the proper standards of care and the causal nexus between [the] defendants' negligence and [the p]laintiffs' damages." To support this contention, the plaintiffs point out that none of the defendants' expert witnesses' reports expressly refutes Dr. James's conclusion that Rodríguez "expired from sepsis

and septic shock, a condition caused by the perforated sigmoid colon that occurred in the initial surgery on April 21, 2016."

In granting the defendants' motions for summary judgment, however, the District Court determined that it was "irrelevant whether [the] defendants' experts' reports . . . refute Dr. James'[s] conclusion" that Rodríguez's sigmoid colon was perforated during her initial surgery.[7]  As the District Court noted, all of the defendants' experts opined that the "defendants' actions did not deviate from the standards of care."  As such, the District Court concluded that the defense experts' trial testimony would not "align . . . with [the] plaintiffs' legal theories or otherwise lend any support to their case."  And, upon a thorough review of the evidentiary record, we find no basis on which to disagree with the determination that Dr. Vélez and Dr. Mateo were entitled to summary judgment.

---

[7]  We note that the District Court gave as one ground for rejecting this challenge to the grant of summary judgment the absence of any evidence in the record that would permit a reasonable juror to find that the colon was perforated on April 21.  But, for the reasons we have explained, there would be such evidence in the record if the District Court erred in excluding under Rule 702 Dr. James's opinion as to when the colon was perforated.  Thus, we address above the District Court's grounds for rejecting the plaintiffs' challenge to its summary judgment ruling on the understanding that such evidence would be in the record, as, for present purposes, we are assuming it was error to exclude that aspect of Dr. James's testimony.

None of the defendants' experts' reports sets forth any opinion that would support the plaintiffs' theory that any negligent act or omission by Dr. Vélez or Dr. Mateo caused Rodríguez's decline and/or her premature death. In his report, Dr. Mateo's proffered expert, Dr. Alfredo S. Colón Martínez, concluded that Dr. Mateo's "involvement in this complicated case [did] not deviate[] from the standards of care" applicable to the procedures in which he participated. And Dr. Vélez's proffered expert, Dr. Adrián Colón Laracuente, concluded in his report that Dr. Vélez "did not deviate from the standard of care in her treatment" of Rodríguez.

True, if the District Court had admitted Dr. James's opinion that Rodríguez's sigmoid colon was perforated during the April 21 surgery performed by Drs. Mateo and Vélez, then a reasonable trier of fact could have inferred that Rodríguez's eventual death from sepsis and septic shock resulted from the surgery on that date. But even if the trier of fact could reasonably infer causation from that opinion, the record would still lack any basis for a finding that either Dr. Vélez or Dr. Mateo committed any breach of an applicable standard of care that led to the perforation of Rodríguez's sigmoid colon during that surgery.

Thus, the record in this case contains no "expert testimony to limn the minimum acceptable standard and confirm the

- 27 -

defendant doctor[s'] failure to meet it," as is required to "establish[] a breach of a physician's duty of care" under Puerto Rico's negligence statute. Cortéz-Irizarry, 111 F.3d at 190. Accordingly, we affirm the District Court's grant of summary judgment to Dr. Vélez and Dr. Mateo.

## III.

Having affirmed the District Court's grant of summary judgment to defendants Dr. Vélez and Dr. Mateo, we now must address the plaintiffs' challenge to the District Court's grant of summary judgment to Quality Health/HSC. Here, too, the plaintiffs base their challenge both on a contention that the District Court erred in excluding under Rule 702 the expert testimony of Dr. James and, in the alternative, on the ground that the District Court erred in granting summary judgment to Quality Health/HSC even assuming that such testimony was properly excluded.

In pressing their challenge to this summary judgment ruling, the plaintiffs appear to be advancing two distinct theories by which their claim of negligence against Quality Health/HSC may survive that defendant's motion for summary judgment. One of these theories is predicated on HSC staff's alleged failure to utilize proper hygiene in their care of Rodríguez. The other is predicated on HSC staff's alleged failure to properly manage Rodríguez's comorbidity of diabetes. We address each of these theories of liability separately, addressing, with respect to each, both the

plaintiffs' challenge to the relevant Rule 702 ruling as to Dr. James's testimony and their contention that, even assuming the Rule 702 ruling was sound, the grant of summary judgment to Quality Health/HSC was not.

## A.

Insofar as the plaintiffs premise their challenge to the grant of summary judgment in favor of Quality Health/HSC on HSC staff's alleged hygiene-related failures, they do so in part by challenging the District Court's decision to exclude Dr. James's testimony under Rule 702. The plaintiffs argue that Dr. James's expert report "clearly express[ed]" multiple "deficiencies" in HSC staff's treatment of Rodríguez. And it is true that several of those alleged deficiencies relate to the plaintiffs' allegation that HSC staff utilized "inappropriate and poor hygiene at [HSC] and in the care of [Rodríguez]." In that regard, the plaintiffs refer to several facts that Dr. James asserts in his expert report leave "little room for doubt regarding the inappropriate nature and poor hygiene which was utilized by [HSC] personnel in caring for [Rodríguez]" -- such as the presence of "several organisms throughout her various organ systems" and "worms and/or maggots" in her nostril, the lack of "evidence of appropriate disinfection of the hospital room, equipment, hospital staff, and the patient herself," and the fact that Rodríguez's "fecal collector remained out of place for more than 24 hours."

Nothing in Dr. James's report purports to opine, however, that any of these hygiene-related failures caused Rodríguez's decline or premature death. Nor is there any other evidence in the summary judgment record that the plaintiffs identify that would provide a basis on which a reasonable trier of fact could find such causation. And that is true even if we take account of the testimony of the defendants' own expert witnesses.

That being so, we do not see how the plaintiffs' challenge to the District Court's ruling to exclude Dr. James's testimony under Rule 702 provides any support for their challenge to the grant of summary judgment to Quality Health/HSC insofar as that challenge rests on a claim of negligence owing to HSC staff's hygiene-related failures in their care for Rodríguez. After all, the plaintiffs' claim of negligence is that the "premature death of [Rodríguez] was caused by the negligent management of her condition." Accordingly, even if we were to assume that there is merit to the plaintiffs' challenge to the District Court's exclusionary ruling under Rule 702 with respect to Dr. James's testimony concerning the poor hygiene-related practices of HSC staff, the plaintiffs' challenge to the grant of summary judgment to Quality Health/HSC fails insofar as it rests on the allegation that HSC staff's failures in that regard caused Rodríguez's decline and premature death.

We turn, then, to the plaintiffs' remaining contention as to their challenge to the grant of summary judgment to Quality Health/HSC -- a contention that rests on the theory that HSC staff's failure to properly manage Rodríguez's comorbidity of diabetes led to her decline and premature death. Here, too, the plaintiffs contend in part that the District Court erred in excluding Dr. James's report under Rule 702. But, once again, they also contend in the alternative that, even if that ruling was sound, the grant of summary judgment was not because they could have relied on other evidence in the record to prove this allegation.

With respect to the plaintiffs' challenge to the Rule 702 ruling, Dr. James's report contains the opinion that "poor management of [Rodríguez's] medical comorbidities, such as inadequate care for her diabetes[,] likely exacerbated her condition and accelerated her demise." With this assertion, Dr. James clearly opines that HSC staff's management of Rodríguez's diabetes was a cause of her premature death. And he also characterizes that management as "poor" and "inadequate."

Nonetheless, the District Court determined that this opinion must be excluded because "nowhere in the report does Dr. James identify the standard of care that [HSC] staff should have adhered to" in their management of Rodríguez's diabetes; "where

- 31 -

that standard comes from; and how the staff deviated from that standard." We agree.

In the absence of both an articulated standard of care and any specific allegations of acts or omissions by HSC staff that deviated from that standard of care, we cannot see that Dr. James's opinion that HSC staff's management of Rodríguez's diabetes was "poor" and "inadequate" is "the product of reliable principles and methods," as Rule 702 requires. Fed. R. Evid. 702(c). Thus, even if we were to assume that it was error for the District Court to have excluded Dr. James's testimony that HSC staff's treatment of Rodríguez's diabetes caused her decline and premature death, we see no basis for concluding that it was error to exclude the portion of Dr. James's opinion that pertains to whether that treatment was improper.

This aspect of our assessment of the plaintiffs' challenge to the District Court's Rule 702 exclusion ends up being dispositive of their summary judgment challenge. That is because, with Dr. James's opinion pertaining to a breach of the duty of care excluded, there is nothing else in the summary judgment record that could make up for it.

None of the defendants' expert witnesses opines that HSC staff's management of Rodríguez's diabetes deviated from any applicable standard of care. On the contrary, Quality Health/HSC's proffered expert witness, internist Dr. Anibelle Altieri Ramirez,

- 32 -

opines in her expert report that "at all times relevant to the [operative] Complaint, [HSC] personnel acted diligently, prudently[,] and reasonably and did not incurred in [sic] negligent acts." Thus, without the existence in the record of "expert testimony to limn the minimum acceptable standard and confirm the defendant doctor[s'] failure to meet it," Cortéz-Irizarry, 111 F.3d at 190, we affirm the District Court's determination that Quality Health/HSC was entitled to summary judgment in its favor on the plaintiffs' claim of medical malpractice.

## IV.

For these reasons, the judgment of the District Court is affirmed.