# United States Court of Appeals
## For the First Circuit

No. 22-1915

RACHEL DOUCETTE, for herself and minor son, B.D.; MICHAEL
DOUCETTE, for himself and minor son, B.D.,

Plaintiffs, Appellants,

v.

CAROL C. JACOBS; MARGARET MAHER; CATHLEEN ESTEP, PH.D.; DONNA F.
STRAIGHT; TOWN OF GEORGETOWN, MASSACHUSETTS; GEORGETOWN SCHOOL
COMMITTEE; GEORGETOWN PUBLIC SCHOOLS,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Judith G. Dein, U.S. Magistrate Judge]

Before

Kayatta, Lipez, and Gelpí,
Circuit Judges

Jacqueline B. Doherty, with whom Philip E. Murray, Jr. and
Murray & Bertrand, P.C. were on brief, for appellants.

Alexandra M. Gill, with whom Doulas I. Louison and Louison,
Costello, Condon & Pfaff, LLP were on brief, for appellees.

July 2, 2024

**LIPEZ**, **Circuit Judge**.  B.D. is a child with significant developmental disabilities.  During the events at issue in this litigation, he was a student at Georgetown Public Schools, where he had an individualized education program ("IEP") as well as a health and safety plan to manage seizures.  B.D.'s parents, Rachel and Michael Doucette ("the Doucettes" or "the family"), blame the school district for a series of five severe seizures that B.D. experienced at school in 2012.  Accordingly, they sued the school district and assorted personnel (collectively, "GPS" or "the district") asserting, as relevant here, claims under 42 U.S.C. § 1983 for the violation of B.D.'s constitutional rights and under Massachusetts tort law.  The district court granted GPS's motion for summary judgment, finding that a reasonable jury could neither conclude that GPS engaged in the conscience-shocking conduct necessary to sustain their constitutional claim nor that GPS was liable under their state-law claims.  We affirm.

**I.**

**A.  Factual Background**

We draw our recitation of the facts from the summary judgment "record -- pleadings, affidavits, depositions, [and] admissions . . . —- viewing the evidence in the light most

favorable to the party opposing summary judgment." Rivera-Colón v. Mills, 635 F.3d 9, 12 (1st Cir. 2011).

### 1. B.D.'s GPS Enrollment and IEP

B.D. attended Perley Elementary School ("Perley" or "the school") from July 2009, when he was three, until November 2012, when he was six. B.D. has been diagnosed with numerous developmental disorders, including Isodicentric Chromosome 15q Duplication Syndrome, autistic spectrum disorder, and attention-deficit hyperactivity disorder. He also has seizures, sleep disturbances, anxiety, cognitive impairment, low muscle tone, and balance deficits. He exhibits several "maladaptive behaviors," such as bolting, episodes of aggression, and difficulty communicating, including feelings of pain or discomfort. Most pertinent here, B.D.'s condition is associated with an increased risk of sudden unexpected death due to cardiac or respiratory arrest, which is heightened by his seizure activity.

B.D. attended school with an IEP. See 20 U.S.C. § 1414(d). An IEP "spells out a personalized" and agreed-upon plan by an educational team, including parents and guardians, "to meet all of the . . . educational needs" of a "child[] with certain physical or intellectual disabilities" to fulfill the federal statutory guarantee of a "free appropriate public education" ("FAPE"). Fry v. Napoleon Cmty. Schs., 580 U.S. 154, 157-58 (2017). "[T]he IEP documents the child's current levels of

academic achievement, specifies measurable annual goals for how [the child] can make progress in the general education curriculum, and lists the special education and related services to be provided so that [the child] can advance appropriately toward [those] goals." Id. at 158-59 (last alteration in original) (internal quotation marks omitted) (quoting 20 U.S.C. §§ 1414(d)(1)(A)(i)(I), (II), (IV)(aa)). The precise details of B.D.'s IEP changed over time, but its core requirements always included the provision of a one-on-one aide to work with B.D., a health and safety plan for B.D., speech and occupational therapy, and an extended school year ("ESY") program. Every iteration of the IEP also emphasized the importance of maintaining "consistency" for B.D.

The Doucettes and GPS had a strained relationship throughout the three years that B.D. attended GPS schools. Within months of B.D. starting at Perley, the family began voicing concerns to administrators and teachers about their adherence to B.D.'s IEP and his safety at school, particularly after learning that B.D. was sometimes left unsupervised. This lack of supervision especially concerned the Doucettes because of B.D.'s proclivity to bolt from class, which on one occasion resulted in B.D. falling from a beanbag chair and hitting his head. Eventually, the Doucettes pulled B.D. out of school from May until September of 2010, though his IEP included ESY services.

- 4 -

That summer, during B.D.'s removal from school, the Doucettes requested a hearing before the Massachusetts Bureau of Special Education Appeals ("BSEA"), seeking amendments to his IEP, an out-of-district placement for B.D., and compensatory services for the time he spent out of school. After a hearing in which both parties were represented by counsel, a hearing officer determined that B.D.'s IEP was inadequate as written and required several amendments to incorporate Applied Behavioral Analysis ("ABA") principles of instruction, including regular consultation with an ABA specialist.[1] However, the hearing officer disagreed with the Doucettes that an out-of-district placement was warranted to provide B.D. with a FAPE, finding insufficient support for the argument that Perley was an unsafe environment. The hearing officer also rejected the Doucettes' request for compensatory services, noting that their lack of cooperation with GPS, and particularly removing B.D. from school, had prevented his IEP from achieving its intended effect. Following the BSEA's decision, B.D. returned to Perley in the fall of 2010 with a new IEP in place.[2]

---

[1] The primary ABA methodology incorporated into B.D.'s educational plan was "discrete trials training," which promotes the development of desired skills or appropriate behaviors by breaking that skill into very discrete components and using repetition to reinforce that behavior.

[2] Though the record contains few examples of safety-related concerns during the 2010-11 school year, aside from the district's handling of B.D.'s seizures discussed below, a couple of incidents

## 2. B.D.'s Seizures

A primary concern of the Doucettes related to GPS's handling of B.D.'s seizures. Because of the risks posed to B.D.'s health, GPS and the Doucettes developed a "seizure action plan" that identified the triggers of B.D.'s seizures and also specified what to do if a seizure occurred. Initially, the seizure action plan listed "sleep deprivation" and "fever" as triggers. As we will discuss below, it was updated to include "stress" as well in late July 2012.

In the Doucettes' view, GPS personnel did not always handle B.D.'s seizures appropriately. In November 2010, for instance, B.D. suffered a possible seizure at school, prompting the Doucettes to raise concerns about two GPS staff members. More specifically, after the incident, B.D.'s primary classroom teacher asked the Doucettes for clarification about what to do in the event of a seizure, leading the Doucettes to worry that the teacher, and potentially others, had not been trained on B.D.'s seizure action

merit brief mention. First, during the 2010-11 school year, a substitute bus driver brought B.D. to the wrong house, delaying his arrival home with the Doucettes unsure of his whereabouts. On two other occasions, a security officer asked B.D.'s mother to move her car during student pickup time, though she was parked in the agreed-upon spot for B.D.'s pickup, prompting her to tell the school that it was not honoring its commitments and that the suggested alternative spot was "illegal and inappropriate" and not a "safe place" to pick up B.D.

plan.[3]  The parents also asked for a nurse to be formally disciplined for contacting B.D.'s neurologist about the event without the parents' consent.[4]

B.D.'s seizure activity increased in the summer of 2011 and the 2011-12 school year.  Among other actions, the Doucettes worked with B.D.'s physicians to get the seizures under control, including a period of seizure monitoring at Massachusetts General Hospital ("MGH") in May 2012 and modifications to his medication regime.  They also coordinated with GPS to ensure B.D.'s safety at school.  In addition to his seizure action plan, the school implemented a seizure tracking form and provided a seizure training protocol for school personnel.

The Doucettes, however, remained unsatisfied with the school's handling of B.D.'s seizures during the 2011-12 school year.  At times, the Doucettes felt the district was inept in evaluating the severity and appropriate response to B.D.'s seizure activity.  For example, B.D.'s seizure action plan did not call

---

[3] By contrast, the record contains several instances of the Doucettes praising the one-on-one aide who worked with B.D. during the regular school year and displayed knowledge of B.D.'s seizure action plan and appropriate action pursuant to it.

[4] On another occasion, a substitute nurse's handling of a bump to B.D.'s head suggested to the parents that she had been unaware of B.D.'s increased risk of seizures.  Around that time, the Doucettes also asserted that the district's occupational therapist was inadequate and demanded an alternative, though it is unclear if that complaint was related to B.D.'s seizures.

for him to be removed from school in the event of "non-emergent, absence seizure/staring spells" or "atypical action seizures" lasting fewer than three minutes.[5] Nonetheless, on three occasions, the school sent B.D. home due to seizures of this nature, prompting the Doucettes to produce a note from B.D.'s physician instructing GPS to keep B.D. in school absent "signs of acute illness." At other times, however, the family felt the district failed to take the risks to B.D.'s health seriously enough -- such as when no nurse was assigned to accompany and monitor B.D. during an off-campus field trip, contrary to B.D.'s IEP and health and safety plan. While B.D. did not suffer any injury during this trip, the Doucettes expressed their frustration with GPS over this "violat[ion] [of] our trust," questioning the school district's commitment to safeguarding B.D.'s wellbeing.[6]

The Doucettes also took issue with an increase to B.D.'s "inclusion time" -- the amount of time B.D. spent integrated with non-disabled peers -- during the 2011-12 school year. While B.D.'s inclusion time had previously been in the range of 0-39

---

[5] The absence-type seizures that B.D. experienced were generally of a short duration and characterized by long staring episodes, unresponsiveness, eye-rolling, and little movement aside from hand tremors and eye blinking.

[6] The record reflects that the Doucettes unsuccessfully renewed their effort to obtain an out-of-district placement for B.D. at the conclusion of the 2011-12 school year, though it does not provide context for this request.

percent, it increased to up to 80 percent that year. In response, the Doucettes provided the school with a report from B.D.'s neurologist connecting this change with an increase in B.D.'s anxiety and aggression and recommending a reduction in his inclusion time.

Another point of contention was B.D.'s service dog, McCloud. In the fall of 2011, McCloud began assisting B.D. with his balance and anxiety, with McCloud alerting when B.D. was experiencing a seizure. When the Doucettes sought to add McCloud to B.D.'s IEP, GPS initially expressed openness to the idea. However, GPS also insisted on first conducting a behavioral assessment of McCloud and pushed back on the Doucettes' request that the school handle and care for McCloud during school hours. Eventually, in July 2012, GPS permitted McCloud to accompany B.D. to school, with B.D.'s mother serving as the dog's handler. Later that month, B.D.'s IEP was formally amended to include a service animal provided by the Doucettes.

### 3. The 2012 ESY Program

Most significant to the Doucettes' claims are the events concerning B.D.'s 2012 ESY program, which ran between June and August of 2012. The program was plagued with what the Doucettes considered to be serious deficiencies. For starters, GPS moved its location to Penn Brook Elementary School ("Penn Brook"), due to construction at Perley, without informing the Doucettes of this

change. Though the decision was made before the end of February 2012, and the Doucettes had an IEP meeting with the school on April 9, they did not learn about the move until a public school board meeting later that month. Eventually, the Doucettes begrudgingly assented to the new location but reiterated the importance of the program being "100% compliant with [B.D.'s] IEP . . . , as we will not tolerate lack of planning or management effectiveness as reason to jeopardize our son's well being."

Despite that admonition, the ESY program did not get off to a smooth start. A few days before the program began, B.D.'s mother took him to Penn Brook to acclimate him to the unfamiliar environment. Based on her observations, the family was certain that "GPS [had] made no attempt to work on a transition plan for [B.D.] regarding the drastic change in location and staff." Among other things, the classroom lacked a proper workspace or supplies, and the playground -- which was shared with a summer day camp for older children -- lacked appropriate equipment and a fence.[7] In response, GPS's superintendent personally promised to rectify these issues before the program began.

Nonetheless, on the program's first day, B.D.'s classroom was still missing certain equipment to which he had grown

_____

[7] The record does not reflect any inadequacy in the playground once the program began. However, B.D.'s mother did raise one safety concern regarding a delivery truck that parked in the playground area one day.

accustomed at Perley, including his Rifton chair,[8] a slant board,[9] and some toys and devices used to reinforce positive behavior ("reinforcers"). GPS brought many of these items, including the chair and slant board, to Penn Brook within a few days, and the school made many other reinforcers available to B.D., if not always the exact ones he had previously used. In the meantime, ESY staff made a makeshift slant board out of cardboard.

The Doucettes also raised concerns about the adequacy and qualifications of ESY staff and about the consistency with which ESY staff implemented B.D.'s IEP. Regarding the adequacy of staffing, one aide assigned to B.D. lacked prior experience in special education, though she was supervised by experienced staff members and was trained on B.D.'s IEP and seizure action plan.[10]

Regarding consistency, the Doucettes took issue with the amount of staff turnover. For instance, the program was not staffed with the speech pathologist with whom B.D. normally worked -- an abrupt change due to the speech pathologist's allergy to McCloud, with no overlapping training period for her replacement.

---

[8] A Rifton chair provides adjustable, supportive seating to help maintain the user's posture at appropriate angles.

[9] A slant board is an angled surface that helps the user hold material for reading or writing.

[10] There is no dispute that the other two aides who worked with B.D. that summer, as well as the Board-Certified Behavioral Analyst who supervised their activity, were well qualified.

In her deposition, B.D.'s mother also described the ESY program as inconsistently implementing elements of B.D.'s daily routine, such as providing B.D. time to eat breakfast or showing him a picture schedule as preparation for transitions throughout the day.

### 4. B.D.'s Severe Seizures

B.D. experienced four seizures while at school during the 2012 ESY program -- on July 5, July 18, July 31, and August 6. The first lasted 40 minutes and necessitated the rectal administration of Diastat gel by a school nurse and a trip to the hospital by ambulance. Following this seizure, B.D.'s mother and McCloud began attending school with B.D., though in none of the remaining instances of B.D.'s seizures did McCloud alert to the seizure, nor did B.D.'s mother notice any signs of stress or any warning signs of seizure.

B.D.'s second seizure lasted 25 minutes and again resulted in the administration of Diastat gel and his transfer to the hospital by ambulance. Following this seizure, the Doucettes again consulted with B.D.'s neurologist, who observed that B.D.'s seizure activity was becoming more frequent but did not opine about the cause. A few weeks later, however, the neurologist signed a new seizure action plan that added stress as a seizure trigger.[11]

---

[11] Sometime during or after the summer of 2012, B.D.'s physicians also "significant[ly] increased . . . [B.D.'s] anti-seizure medications" to address his seizure activity.

B.D.'s other two seizures that summer followed the same general pattern, the third seizure lasting 23 minutes, and the fourth lasting at least 15 minutes. On both occasions, B.D. was administered Diastat gel and transported to the hospital by ambulance. Following B.D.'s fourth seizure, the Doucettes removed him from school for the remainder of the summer.

The Doucettes believed that the poor execution of the ESY program -- and, in particular, the lack of consistency in equipment, staffing, and program implementation -- was to blame for B.D.'s seizures by causing stress and anxiety that triggered the seizures. They again consulted B.D.'s neurologist, who produced a letter stating that B.D.'s current school program had been inadequate in terms of managing his seizures and that the likely trigger of the seizures was "increased anxiety at his school program." The letter also recommended that GPS and the Doucettes revise B.D.'s IEP to allow for "appropriate placement" and that B.D. remain out of school in the interim.

Subsequently, the Doucettes met with GPS to discuss B.D.'s IEP, with the parties evidently agreeing that B.D. should resume attending Perley at the beginning of the 2012-13 school year and have Perley's program observed by an independent third party.[12] In a follow-up communication, a GPS administrator

_____

[12] In an email following the meeting, the Doucettes objected to keeping B.D. at Perley. The resolution of this dispute is not

- 13 -

cautioned the Doucettes that "[a]ny extended absence will be considered truancy."

On September 5, 2012, the first day of the new school year, B.D. experienced another seizure upon arriving at school with his mother via school bus. The seizure lasted up to 20 minutes and once again necessitated the administration of Diastat gel and ambulance transport to the hospital. Hospital records characterize the seizure as an "absence-type seizure (his usual per mother who was present)" and a "staring episode."[13] At a meeting a few days later, the Doucettes informed GPS that they would not allow B.D. to return to school.

---

apparent in the record; however, it is undisputed that B.D. returned to Perley at the beginning of the 2012-13 school year.

[13] The parties dispute the severity of the five seizures discussed above. The Doucettes characterize them as tonic-clonic seizures, which are more dangerous than the absence seizures B.D. had previously experienced. The record contains no formal diagnosis supporting that conclusion, and school staff reported that the seizures appeared no different than B.D.'s previous seizures. GPS also produced expert testimony opining that B.D.'s seizures were not tonic-clonic seizures.

However, the first responder notes describe several of these seizures as "grand mal" seizures, an equivalent medical term for tonic-clonic seizures. Moreover, it does not appear that B.D. had previously been administered Diastat gel or transported to the hospital for any other seizures suffered at school besides these five seizures, or that any of his other seizures lasted nearly as long. Construing the record in the Doucettes' favor, Rivera-Colón, 635 at 12, we conclude that a reasonable jury could, at the very least, determine that the five seizures were more severe than those B.D. had previously experienced. Ultimately, however, the severity of the seizures is not significant to the outcome of the Doucettes' claims.

Thereafter, the Doucettes obtained medical opinions recommending an "outside placement" for B.D. that included consistent, year-round ABA-based programming rather than an ESY program, in a "small" and "specialized" setting rather than a "large, fast-pace public school setting." Following an extended evaluation period, GPS agreed to an out-of-district placement at the Greater Lawrence Educational Collaborative ("GLEC").

B.D. attended GLEC for nearly two years, during which time his neurologist reported that B.D. was "doing very well" and that the switch to GLEC "had a positive impact on essentially all aspects of his health and development." In March 2014, however, B.D. experienced what his neurologist's notes describe as a psychotic episode, characterized by "increased aggression, paranoia and hallucinations," as well as "agitation" and "dysregulation." This episode did not involve any seizures. He was admitted to MGH for one week and then Hampstead Hospital in New Hampshire for three months. Afterwards, B.D. began attending a residential and educational program at the Berkshire Meadows School in Massachusetts ("Berkshire Meadows"), where he made "excellent progress on a strict behavioral program with lots of consistency, structure, and a positive approach." B.D. has not experienced a seizure since leaving GPS.

## B. Procedural Background

The Doucettes originally filed their complaint in Massachusetts state court, with GPS removing the case to federal court. In their complaint, the Doucettes allege a count under 42 U.S.C. § 1983 for various violations of constitutional and statutory rights, including B.D.'s substantive due process rights under the Fourteenth Amendment, a count under section 504 of the Rehabilitation Act, 29 U.S.C. 794, and state tort claims for negligence, negligent infliction of emotional distress, intentional infliction of emotional distress, and loss of consortium. The district court initially granted judgment on the pleadings for GPS on the federal claims based on the Doucettes' failure to exhaust administrative remedies. See Doucette v. Jacobs, 288 F. Supp. 3d 459, 463-64 (D. Mass. 2018) ("Doucette I"). However, we vacated that judgment, finding the exhaustion requirement of the Individuals with Disabilities Education Act ("IDEA") inapplicable to some of their claims and satisfied as to others, see Doucette v. Georgetown Pub. Schs., 936 F.3d 16, 19 (1st Cir. 2019) ("Doucette II").[14]

---

[14] As we recognized in our prior opinion, the Doucettes waived § 1983 claims related to procedural due process, equal protection, and B.D.'s rights under the Rehabilitation Act and the IDEA. Doucette II, 936 F.3d at 28 n.18. They have also voluntarily dismissed their negligence and negligent infliction of emotional distress claims against the individual defendants. Doucette v. Jacobs, No. 15-13193, 2022 WL 2704482, at *1 n.1 (D. Mass. July 12, 2022).

On remand, the district court granted GPS's motion for summary judgment on all counts. See Doucette v. Jacobs, No. 15-13193, 2022 WL 2704482 (D. Mass. July 12, 2022) ("Doucette III"). As to the substantive due process claim, the district court held that a reasonable jury could not find that GPS engaged in the conscience-shocking behavior necessary to sustain such a claim. Id. at *1, **12-26. On the Rehabilitation Act claim, the district court observed that the Doucettes had waived what had theretofore been their primary theory, which is that GPS had discriminated against B.D. by its resistance to B.D.'s service dog accompanying him to school, and found the claim otherwise meritless. Id. at *26. Finally, the district court granted summary judgment to GPS on the state-law claims, finding its analysis of the federal claims to compel that result. Id. at *27.

Of particular significance to this appeal, in reaching its decision, the district court exercised its "gatekeeping role" under Federal Rule of Evidence 702 to exclude from the summary judgment record an expert report by Dr. Sue X. Ming. Dr. Ming's report concluded that GPS's failures to meet B.D.'s IEP requirements and lack of consistency in implementing the 2012 ESY program "caused the dramatic increase in his seizure activity," which produced a significant regression in his physical,

cognitive, and developmental condition.[15] Id. at *23. The district court found that the report was inadmissible because it was vague and ignored important events in the record, particularly the two years B.D. spent at GLEC and his later psychotic episode.

The district court denied the Doucettes' motion to alter or amend the judgment, and this timely appeal ensued. On appeal, the Doucettes challenge the district court's rejection of their § 1983 and state-law claims,[16] while also arguing that the court's exclusion of Dr. Ming's report was an abuse of discretion.

**II.**

We begin with the Doucettes' contention that the district court abused its discretion by excluding Dr. Ming's expert report under Rule 702.

---

[15] Putting Dr. Ming's report aside, the record contains little information clarifying how B.D.'s present condition compares to his condition while at GPS, including the extent to which he experienced developmental regression attributable to his five severe seizures. Ultimately, this question does not prove relevant to the issues on appeal.

[16] In their opening brief, the Doucettes devote only half a sentence to the merits of their Rehabilitation Act claim. At oral argument, moreover, when asked to clarify whether they were continuing to pursue that claim the Doucettes' counsel offered no analysis of it, instead discussing how the events that had been the focus of that claim -- GPS's pushback on the service dog -- supported their constitutional claim. Because the Doucettes have developed no appellate argument regarding their Rehabilitation Act claim, we deem them to have waived that issue. See, e.g., United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

- 18 -

## A. Standard of Review

We give the district court "as much leeway in dealing with [evidentiary] matters at the summary judgment stage as at trial." Alt. Sys. Concepts, Inc. v. Synopsys, Inc., 374 F.3d 23, 31-32 (1st Cir. 2004). Accordingly, we review a district court's evidentiary rulings in the lead up to summary judgment for abuse of discretion. See Williams v. Am. Honda Fin. Corp., 907 F.3d 83, 86 (1st Cir. 2018). Under this "deferential" standard, we will disturb the district court's decision only if "the court committed a clear error of judgment," mindful that we must not displace the district court's judgment with our own. Alt. Sys. Concepts, 374 F.3d at 32.

## B. Exclusion of the Expert Report

Under Federal Rule of Evidence 702,[17] a district court may properly exclude unreliable, and therefore inadmissible,

---

[17] At the time of the district court's summary judgment ruling, Rule 702 provided, in full:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

expert testimony when deciding a motion for summary judgment. See, e.g., Rodríguez v. Hosp. San Cristobal, Inc., 91 F.4th 59, 69-72 (1st Cir. 2024). The court ought not do so "profligately," however, as "[a] trial setting normally will provide the best operating environment for [such] triage." Cortés-Irizarry v. Corporación Insular de Seguros, 111 F.3d 184, 188 (1st Cir. 1997). Accordingly, we must decide if the district court exercised its discretion reasonably in ruling that Dr. Ming's expert report represented one of those clear-cut cases because the report's "defects [we]re obvious on the face of [the] proffer." Id.

The objective of the "flexible" inquiry envisioned by Rule 702 is to ascertain "the scientific validity and thus the evidentiary relevance and reliability" of the proffered expert testimony. Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 594-95 (1993). "The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." Id. at 595. Therefore, "'[w]hen the factual underpinning of an

---

Fed. R. Evid. 702 (2011). In 2023, Rule 702 was amended to directly state that the proponent of the expert testimony must establish these reliability requirements by a preponderance of the evidence, a principle already established in our case law. See Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse Sec. (USA) LLC, 752 F.3d 82, 96 (1st Cir. 2014) ("The proponent . . . must prove by a preponderance of the evidence that the [expert] testimony is reliable." (quoting Moore v. Ashland Chem. Inc., 151 F.3d 269, 276 (5th Cir. 1998))).

expert's opinion is weak,'" -- because, for instance, the expert's conclusion is arguably contradicted by aspects of the record -- but the expert's methodology itself is sound, that "'is a matter affecting the weight and credibility of the testimony' and thus 'a question to be resolved by the jury.'" Rodríguez, 91 F.4th at 70 (quoting Milward v. Acuity Specialty Prods. Grp., Inc., 639 F.3d 11, 22 (1st Cir. 2011)).

A district court is well-justified in striking opinion testimony that depends upon "the ipse dixit of the expert" or that evinces significant "analytical gap[s] between the data and the opinion proffered." Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997). Thus, an expert's "failure to point to and consider material" elements of the record she purports to be analyzing can be grounds for a district court's exclusion of the proffered testimony. González-Arroyo v. Doctors' Ctr. Hosp. Bayamón, Inc., 54 F.4th 7, 15 (1st Cir. 2022). So too can the expert's failure to "explain [a] conclusory finding" by reference to the facts at hand or by connecting those facts to relevant insights drawn from the expert's applied methodology or the academic literature. López-Ramírez v. Toledo-González, 32 F.4th 87, 95 (1st Cir. 2022) (internal quotation marks omitted).

The district court identified several such defects when determining that Dr. Ming's expert report fell below the requisite standard of reliability. For one thing, the court observed that

Dr. Ming's report depended on "generalized description[s]" of the record, lumping together events without accounting for their individual significance. Doucette III, 2022 WL 2704482, at *24. For instance, Dr. Ming accused GPS of failing to meet "several of B.D.'s IEP requirements" without explaining which requirements they failed to satisfy or how each failure impacted B.D. Id. And she decried an "unusually high number of changes" to B.D.'s learning environment without describing those changes, explaining their abnormality, or addressing how they affected him. Id. Similarly, she concluded that B.D.'s stress at school caused his seizures without explaining where she derived her assumption that B.D. was stressed when he experienced seizures or that GPS's actions caused the stress.

The district court was especially concerned by Dr. Ming's omission of critical facts in her expert report. For instance, when addressing the inconsistency with which GPS implemented B.D.'s IEP during the ESY program, the report noted that several of B.D.'s reinforcers were missing from Penn Brook when the program began. But the report did not acknowledge that the school obtained these items, or substitutes, within a few days or explain how (or if) these actions influenced the analysis. This omission was particularly notable because the reinforcers were restored several days before any of B.D.'s seizures occurred. Even more troubling to the district court, in concluding that any

regression in B.D.'s present condition was caused by his seizures in 2012 (and thus arguably attributable to GPS), Dr. Ming's report entirely ignored that B.D. had spent two years in another school before arriving at his current residential placement at Berkshire Meadows.[18] Moreover, during those two years, his doctors indicated that his condition largely was on a positive trajectory, but he also suffered a serious psychotic episode that precipitated his residential placement. The report offered no analysis of these events and their effect, if any, on B.D.'s present condition.

The district court found that Dr. Ming's failure to even consider these aspects of the record was "simply too great an analytical gap" to ignore. Id. (quoting McGovern ex rel. McGovern v. Brigham & Women's Hosp., 584 F. Supp. 2d 418, 426 (D. Mass. 2008); see also Gen. Elec., 522 U.S. at 146. Although the Doucettes argue that the district court, in raising these concerns, impermissibly took aim at Dr. Ming's reasoning and conclusions, rather than the reliability of her scientific methods, we disagree. Fundamentally, Dr. Ming's failure to ground her conclusions in the specifics of the record -- or even to consider key aspects of the record -- meant that the report fell short of Rule 702's

_____

[18] The Doucettes point out that Dr. Ming's report does acknowledge these events in an attached "Summary of Pertinent Records." The district court's objection, however, was not that Dr. Ming was ignorant of these events. Rather, the court faulted Dr. Ming for opining on GPS's role in B.D.'s condition while ignoring these events.

requirements that her "testimony [be] based on sufficient facts or data" and that she "reliabl[y] appl[y] the principles and methods to the facts of the case." Fed. R. Evid. 702(b), (d). We therefore discern no abuse of the court's discretion in the substance of its well-supported decision to exclude Dr. Ming's expert testimony.

The Doucettes also raise procedural objections, specifically that the district court struck Dr. Ming's expert report without a Daubert hearing or an opportunity for the Doucettes to brief the issue. As for the lack of a Daubert hearing, we have made clear that no such hearing is required when, as here, no novel issue is at stake. See, e.g., González-Arroyo, 54 F.4th at 15. Likewise, the district court's decision to strike Dr. Ming's expert report sua sponte was well within its discretionary gatekeeper role. After all, the district court "must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152 (1999); see also González-Arroyo, 54 F.4th at 15 (rejecting argument that district court should have sua sponte ordered a Daubert hearing before excluding evidence and stressing that "there is no particular procedure that [the court] is required to follow" absent a novel issue (internal quotation marks omitted) (alteration in original)). Here, for the reasons described above, the inadequacy of the report's reasoning was "obvious on [its] face,"

Cortes-Irizarry, 111 F.3d at 188, and thus excluding the report sua sponte was not an abuse of discretion.

III.

We now turn to the Doucettes' appeal of the district court's summary judgment for GPS on their preserved claims under § 1983 and Massachusetts law.  Our review of a district court's summary judgment decision is de novo.  See, e.g., Theidon v. Harvard Univ., 948 F.3d 477, 494 (1st Cir. 2020).  Our task is to determine whether there is any genuine dispute of material fact that would preclude judgement in GPS's favor as a matter of law. Id.

## A.  Section 1983 Claim

The Doucettes claim that GPS violated B.D.'s Fourteenth Amendment substantive due process rights.  As we previously summarized, their theory is that GPS's "conduct amounted to deliberate indifference and severe, pervasive disregard for the safety and well-being of B.D. and that, as a result, B.D. suffered great physical and emotional harm, including five life-threatening tonic-clonic seizures."  Doucette II, 936 F.3d at 29 (internal quotation marks and brackets omitted).

### 1. Background Law

In cases involving "executive" (as opposed to "legislative") action, our substantive due process precedents demand that we first determine whether the defendants' conduct

"shocks the conscience." See Martínez v. Cui, 608 F.3d 54, 63-64 (1st Cir. 2010); see also County of Sacramento v. Lewis, 523 U.S. 833, 846 (1998). Here, it is undisputed that the conduct at issue -- all of which involved GPS's implementation of B.D.'s IEP and its adherence to his health and safety plan -- was executive action. Thus, only if the facts cross the shocks-the-conscience threshold should we move on to assess whether GPS violated B.D.'s fundamental rights.

While the shocks-the-conscience standard is "no calibrated yard stick," Lewis, 523 U.S. at 847, the "test is an extremely demanding one, . . . limit[ing] executive action only when that action 'was infected or driven by something much worse -- more blameworthy -- then mere negligence, or lack of proper compassion, or sense of fairness.'" González-Fuentes v. Molina, 607 F.3d 864, 885 (1st Cir. 2010) (quoting Hawkins v. Freeman, 195 F.3d 732, 746 (4th Cir. 1999) (en banc)). Accordingly, we will not find a substantive due process violation where the record contains "no act so extreme, egregious, or outrageously offensive as to shock the contemporary conscience." DePoutot v. Raffaelly, 424 F.3d 112, 119 (1st Cir. 2005); see also González-Droz v. González-Colón, 660 F.3d 1, 16 (1st Cir. 2011) ("To sink to [the] level" of conscience-shocking, the challenged conduct must be "'truly outrageous, uncivilized, and

intolerable.'" (quoting Hasenfus v. LaJeunesse, 175 F.3d 68, 72 (1st Cir. 1999))).

The determination as to whether conduct "shocks the conscience" is "necessarily fact-specific and unique to the particular circumstances." González-Fuentes, 607 F.3d at 881 (quoting Cruz-Erazo v. Rivera-Montañez, 212 F.3d 617, 623 (1st Cir. 2000)). "[W]here government officials must act in haste," for instance, only actions "undertaken maliciously and sadistically for the very purpose of causing harm" will suffice. Coyne v. Cronin, 386 F.3d 280, 288 (1st Cir. 2004). On the other hand, "[w]here actual deliberation on the part of a governmental defendant is practical," "deliberate indifference" can constitute "conscience-shocking activity." Id. To establish deliberate indifference, the plaintiff must show "at a bare minimum," that the defendant "actually knew of a substantial risk of serious harm" but "disregarded that risk." Id.

We have acknowledged that schools may have a duty under the Due Process Clause to protect students when faced with specific known hazards or perils, particularly when it comes to students who are "manifestly unable to look after themselves," such as "very young children." Hasenfus, 175 F.3d at 72.[19] We cautioned,

---

[19] We further noted that "due process constraints may exist" when "a state official acts so as to create or even markedly increase a risk." Hasenfus, 175 F.3d at 73; see also Irish v.

- 27 -

however, that to shock the conscience, only a case with truly "pungent" or "outrageous" facts could support a constitutional claim that a school acted with deliberate indifference. Id. at 72-73. Accordingly, in Hasenfus we declined to hold a school liable under the Due Process Clause for a high school student's suicide attempt at school after a teacher harshly reprimanded her and sent her to an unsupervised location, finding that these unfortunate facts exhibited no conscious disregard of a known risk to the student, or that the teacher "acted maliciously to cause harm." Id. at 73.

## 2. Discussion

The Doucettes focus primarily on GPS's errors during the 2012 ESY program, which preceded and are most closely linked in time to B.D.'s final five seizures. To be sure, GPS made mistakes, some of which are troubling. There is the absence of B.D.'s accustomed reinforcers at the beginning of the program, and in particular GPS's decision to temporarily replace his slant board with a makeshift cardboard device. It was reasonable for the Doucettes to expect B.D.'s special education team to know and understand -- particularly in light of the requirement for "consistency" in B.D.'s IEP -- that B.D. had difficulty adapting to unexpected changes. By extension, it seems reasonably

Fowler, 979 F.3d 65, 75 (1st Cir. 2020) (recognizing availability of a "state-created danger" substantive due process claim).

- 28 -

foreseeable that B.D. would experience stress or anxiety if deprived of accustomed equipment or asked to use a crude cardboard alternative. Indeed, several days before the ESY program began, B.D.'s mother pointed out that B.D.'s classroom at Penn Brook lacked these items and that this could make the transition to a new school environment even more difficult. That GPS nonetheless did not have B.D.'s reinforcers ready was a notable failure.

It does not, however, shock the conscience. GPS quickly rectified the issue, bringing B.D.'s reinforcers to his classroom within a few days. Although that promptness does not excuse the breakdown in preparedness, it does undermine the Doucette's claim that the school's sloppiness reflected deliberate indifference to B.D.'s safety, an essential element of their substantive due process claim. See, e.g., Melissa S. v. Sch. Dist. of Pittsburgh, 183 F. App'x 184, 188-89 (3d Cir. 2006) (finding no deliberate indifference in school district's alleged failure to adhere to student's IEP where the school rectified the lapse "almost immediately"). True, B.D.'s IEP also called for "consistency," but that does not mean that any deviation from B.D.'s routine, especially when quickly rectified, amounts to the sort of "outrageous, uncivilized, [or] intolerable" conduct that shocks the conscience.[20] Hausenfus, 175 F.3d at 72.

_____

[20] We note that GPS supplied an expert report opining that the school "complied with the consistency element of B.D.'s IEP,"

- 29 -

Nor do any of GPS's other missteps during the ESY program rise to the level of conscience-shocking. Other lapses in preparation, such as the absence of a fence in the playground, were also quickly rectified, again showing GPS's efforts to attend to B.D.'s needs, if belatedly, rather than indifference to them. And while the Doucettes were upset about the program's location change, the reason for that change -- extensive construction at Perley -- was clearly reasonable. The Doucettes focus on the timing of the school's notice to them of the change -- and the record does support that GPS could have informed them sooner. Nonetheless, they did learn of the change well ahead of time, approximately two months before the program began.

Finally, the record does not reflect any serious shortcomings in the competency of ESY staff or their adherence to B.D.'s seizure plan that summer. Though one of B.D.'s aides lacked experience, the record establishes that she was qualified for the position and given relevant training, and she was not the sole provider in any event. Likewise, there are no documented examples of any other ESY personnel causing B.D. stress or anxiety at the

---

notwithstanding that B.D.'s exact reinforcers were initially missing. By contrast, the Doucettes have produced no expert testimony corroborating their assertion that the school acted unreasonably in failing to have B.D.'s exact reinforcers on hand at the beginning of the ESY program, let alone that this lapse caused him to experience stress or anxiety that ultimately caused his seizures.

times that he suffered any of his seizures, or any oversight on their part that a seizure was impending. Indeed, although B.D.'s mother and McCloud were present for all but B.D.'s first seizure, McCloud never alerted to any seizure or increased stress or anxiety, and B.D.'s mother testified that she did not notice any such signs. We thus fail to see how a reasonable jury could ascribe to GPS any deliberately indifferent conduct giving rise to or exacerbating B.D.'s seizures.

Looking beyond the summer of 2012, we likewise do not observe any of the "pungent" or "outrageous" facts necessary to establish GPS's deliberate indifference to B.D.'s needs. Hasenfus, 175 F.3d at 72-73. The Doucettes claim that GPS was cavalier with regard to B.D.'s seizure action plan, but this assertion is not supported by the record. To be sure, the incident during which B.D. attended a field trip without a nurse assigned to him is troubling, particularly because the Doucettes had reiterated to his educational team just days earlier the importance of assigning a nurse to B.D. on field trips. Yet the record also unequivocally shows that the school immediately sought to correct the situation, informing the Doucettes of the error and quickly implementing new procedures to ensure that it would not happen again -- and the record does not reveal that it ever did happen

again.[21]  Once again, this episode does not meet the "minimum" requirement of disregard for known risks to B.D.'s health, see Coyne, 386 F.3d at 288; see also Hasenfus, 175 F.3d at 68 (rejecting even "seriously negligent" conduct as rising to the level of conscience-shocking).

As for the times when individual school personnel appeared unfamiliar with B.D.'s seizure action plan or some of its details, none of these incidents reveals any deliberate disregard for B.D.'s health or safety.  For instance, it is understandable that a substitute nurse would be less familiar with the seizure action plan than the regular nurse.[22]  Moreover, several of the Doucettes' complaints regarding familiarity with the seizure action plan -- such as when the school wrongly sent B.D. home due to less serious seizure activity, when the school nurse contacted B.D.'s neurologist without the Doucettes' consent, or when B.D.'s classroom teacher asked for clarification about the seizure action plan -- reflect GPS personnel exercising extra caution regarding B.D.'s seizures.  It may have been preferable for school personnel

_____

[21] Moreover, there were several staff members on the field trip who had been trained on B.D.'s medical needs, including another nurse (just not one assigned to him specifically).

[22] Similarly, it is understandable that a substitute bus driver could make a one-time mistake on B.D.'s bus route without that event amounting to a display of deliberate indifference. Likewise, a security officer's unfamiliarity with B.D.'s mother's appointed pick-up zone is also not evidence of deliberate indifference.

to have better understood B.D.'s seizure action plan. It is understandable that the Doucettes felt these incidents unmasked worrisome gaps in GPS's understanding of their son's medical needs and educational plan. But none of these episodes shows that GPS was indifferent to the risk of B.D.'s seizures. Indeed, if anything, they show precisely the opposite.

Nor do we find that any of the events concerning B.D.'s service dog demonstrate deliberate indifference. Indeed, the record shows that GPS was open to having McCloud accompany B.D. to school.[23] The school's insistence on assessing the dog's behavior in school and its expectation that the Doucettes would handle and care for McCloud at school reflect the school's reasonable desire to prevent this accommodation from being disruptive to the educational environment. Moreover, following B.D.'s first seizure during the 2012 ESY program, GPS adjusted its position on the service dog in deference to B.D.'s needs, allowing McCloud to accompany B.D. to school with B.D.'s mother as his handler and

_____

[23] The Doucettes highlight that in one email GPS superintendent Carol Jacobs said "OK let the games begin" in reference to a planned visit by B.D.'s mother to school to do a behavioral assessment with McCloud. As the district court noted, in context, this remark does not carry any mocking tone. Indeed, in the next sentences, Jacobs went on to say "Seriously, do we feel that everything is all set? I am looking at this as an opportunity for [B.D.'s mother] to see that the work that you are all doing is awesome."

ultimately agreeing to amend B.D.'s IEP to include a service animal sooner than anticipated.

Lastly, GPS's repeated refusal to agree to an out-of-district placement also does not shock the conscience. GPS's initial opposition to an out-of-district placement was validated by the holding of the BSEA hearing officer, who found no evidence that B.D. was unsafe at Perley. The Doucettes acquiesced to that determination and, indeed, kept B.D. at Perley for more than a year longer, agreeing to that placement on several additional occasions, even after the 2012 ESY program. While the Doucettes argue that the remark that B.D.'s absence would be considered truancy amounted to coercion to keep B.D. placed at Perley, we do not think a reasonable jury could reach that conclusion. In context, it is clear this remark was not a threat meant to force B.D.'s return to Perley but simply reflected the school's view that B.D.'s return was in his best interest and that, in light of the parties' recent history, there was reason to doubt that the Doucettes would adhere to the agreed-upon placement at Perley. Moreover, once again, GPS adjusted its position when B.D.'s seizure activity became more severe and the Doucettes produced medical opinions backing up their request for an out-of-district placement. It is impossible to conclude that GPS's measured and ultimately flexible approach to that question demonstrated indifference to B.D.'s well-being.

In short, because a reasonable jury could not conclude from this summary judgment record that GPS was so deliberately indifferent to B.D.'s health that it shocks the conscience, we affirm the district court's grant of summary judgment to GPS on the Doucettes' § 1983 claim.

## B. State-Law Claims[24]

### 1. Negligence

The Doucettes assert that GPS acted negligently in carrying out B.D.'s IEP and his health and safety plan, causing the five severe seizures he suffered in the summer and fall of

---

[24] The district court exercised supplemental jurisdiction over the Doucettes' state-law claims. See 28 U.S.C. § 1367. When, as here, the federal claims upon which supplemental jurisdiction is premised fall out of the case, the district court "must reassess its jurisdiction" before retaining jurisdiction over the state-law claims. Camelio v. Am. Fed'n, 137 F.3d 666, 672 (1st Cir. 1998); see also 28 U.S.C. § 1367(c)(3). This assessment depends upon a "'pragmatic and case-specific evaluation of a variety of considerations,' including 'the interests of fairness, judicial economy, convenience, and comity'" as the litigation presently stands. Desjardins v. Willard, 777 F.3d 43, 45 (1st Cir. 2015) (quoting Camelio, 137 F.3d at 672).

In its first decision, after dismissing the federal claims on exhaustion grounds, the district court remanded the state claims to state court. See Doucette I, 288 F. Supp. at 463-64. Here, after our remand to the district court in Doucette II, the district court implicitly reassessed its supplemental jurisdiction in finding that the state-law claims easily failed for reasons similar to those supporting dismissal of the federal claims. See Doucette III, 2022 WL 2704482 at *27. We agree with the district court's assessment that the exercise of supplemental jurisdiction was proper, as the state-law claims litigated in this case for several years do not require us to wade into complex or unsettled areas of state law. See Zell v. Ricci, 957 F.3d 1, 15-16 (1st Cir. 2020).

- 35 -

2012 and subsequent long-term consequences for his health connected to those seizures.

To succeed on a negligence claim, a plaintiff must prove "each and every element of that claim: duty, breach of duty[,] . . . causation (actual and proximate)[,] and damages." Bennett v. Eagle Brook Country Store, Inc., 557 N.E.2d 1166, 1168 (Mass. 1990). To avoid delving unnecessarily into issues of state law, we will bypass the elements of duty, breach, and damages, and focus on the issue of causation. For the same reason, we decline to consider the two alternative defenses to liability that GPS raises to the Doucettes' negligence claim: (1) that it is an impermissible "educational malpractice claim," and (2) that it is precluded by the "discretionary function" exemption to the Massachusetts Tort Claims Act. See Mass. Gen. Laws Ann. ch. 258, § 10(b).[25]

---

[25] It is true that Massachusetts courts have not embraced educational malpractice claims, see Durbeck v. Suffolk Univ., 547 F. Supp. 3d 133, 139 (D. Mass. 2021), though there appears to be little Massachusetts case law on the subject. Other courts, however, have explained that such claims generally challenge the "quality of the education" a school provides by "ask[ing] a court to evaluate the course of instruction or the soundness of a method of teaching," Gociman v. Loyola Univ. of Chi., 41 F.4th 873, 882 (7th Cir. 2022), and it is not clear that the Doucettes' challenge to GPS's purported failure to keep B.D. safe matches that formulation.

Likewise, while GPS cites Bencic v. City of Malden, 587 N.E.2d 795, 796 (Mass. App. Ct. 1992), to support its assertion that the discretionary function exception covers this case, it appears that that decision was abrogated by Harry Stoller & Co. v. City of Lowell, 587 N.E.2d 780, 784-85 (Mass. 1992). See Alake v. City of

Our analysis focuses on but-for causation, which is established when a plaintiff "show[s] that there was greater likelihood or probability that the harm complained of was due to causes for which the defendant was responsible than from any other cause."  Lieberman v. Powers, 873 N.E.2d 803, 808 (Mass. App. Ct. 2007) (quoting Mullins v. Pine Manor Coll., 449 N.E.2d 331, 338-39 (Mass. 1983)).

We must thus assess whether a reasonable jury could conclude, at a minimum, that GPS's acts or omissions were the but-for cause of B.D.'s five severe seizures in the summer and fall of 2012.  Dr. Ming's expert report directly opines that GPS's shortcomings caused B.D.'s five severe seizures, but the district court justifiably excluded Dr. Ming's expert report from the summary judgment record.  See Section II supra.  There is no other expert testimony supporting the notion that B.D.'s seizures were attributable to GPS's actions.  To the contrary, GPS has produced an expert report by Dr. Mara Cvejic opining that "nothing the defendants did or failed to do caused or contributed to the seizures [B.D.] experienced while a student of GPS."  Without any expert evidence supporting the notion that GPS caused B.D.'s seizures, the Doucettes are unable to carry their burden, "[a]s

Bos., 666 N.E.2d 1022, 1024-25 & 1025 n.7 (Mass. App. Ct. 1996) (recognizing Stoller's abrogation of Bencic).  It is not otherwise clear under Massachusetts law that all of GPS's challenged conduct is covered by the discretionary function exception.

[it] is well-established under Massachusetts law[] [that] 'expert testimony is required to establish medical causation.'"[26] Milward v. Rust-Oleum Corp., 820 F.3d 469, 476 (1st Cir. 2016) (quoting Reckis v. Johnson & Johnson, 28 N.E.3d 445, 461 (Mass. 2015)).

Because on this record a reasonable jury could not conclude that B.D.'s seizures were caused by GPS's conduct, we affirm the district court's grant of summary judgment in GPS's favor on the general negligence count.

## 2. The Doucettes' Remaining State-Law Claims

Under Massachusetts law, causation is an essential element of all three of the Doucettes' other state-law claims. See Lanier v. President & Fellows of Harvard Coll., 191 N.E.3d 1063, 1075 (Mass. 2022) (listing causation as an element of intentional or reckless infliction of emotional distress claims); Rodriguez v. Cambridge Hous. Auth., 823 N.E.2d 1249, 1253 (Mass. 2005) (listing causation as an element of negligent infliction of emotional distress claims); Mass. Gen. Laws Ann. ch. 231, § 85X ("The parents of a minor child or an adult child who is dependent on his parents for support shall have a cause of action for loss

---

[26] We note, moreover, that none of the contemporaneous medical evidence within the record -- such as B.D.'s medical records pertaining to his increased seizure activity -- indicates that any act or omission by GPS caused B.D.'s seizures.  Indeed, none of these events -- such as GPS's failure to have B.D.'s reinforcers ready at the beginning of the ESY program -- even happened at the same time as any of B.D.'s five severe seizures.

of consortium of the child who has been seriously injured against any person who is <u>legally responsible for causing such injury</u>." (Emphasis added)). The Doucettes depend upon the same basic theory of causation -- rejected above -- for all three claims, and thus their failure to establish that GPS caused B.D.'s seizures means that these claims fail as well.

**IV.**

In light of the foregoing analysis, we affirm the district court's award of summary judgment in favor of GPS.

<u>So ordered.</u>